JOEL F. SHEPPARD & others *vs.* CHARLES M. BRYANT.

Norfolk.     January 15, 1906. — May 17, 1906.

Present: KNOWLTON, C. J., MORTON, LATHROP, HAMMOND, & SHELDON, JJ.

*Libel and Slander.*

Words spoken by a witness testifying under oath before a legislative committee in an inquiry within the jurisdiction of the committee and pertinent to the matter under investigation are absolutely privileged.

The mayor of a city was summoned as a witness before a legislative committee, appointed at a time when the community was suffering from a great and unusual scarcity of coal " to ascertain if any attempt is being made, or has been made, to prevent coal from being transported to and delivered at its destination or placed on the market as speedily as it might be, and to determine whether the high prices at which coal is sold and has been sold are unavoidable or the result of an attempt on the part of the dealers, at wholesale or retail, to make excessive profits." Having been sworn, the witness testified that he had had some experience in efforts to secure coal for the people of the city of which he was mayor and the vicinity, whereupon the chairman addressed to him the question " The committee would like to hear about it in your own way." To this question the witness made a long answer. *Held,* that under the circumstances the witness, as he went on with his answer, had the right to assume that if he stated anything not wanted by the committee he would be interrupted by the chairman, and that, in the absence of such an interruption, he was giving the information for which the chairman asked, and therefore that his answers might be regarded as responsive and pertinent to the matter under investigation, so as to be absolutely privileged and not the subject for an action for slander by retail coal dealers mentioned in his testimony ; although in the present case the court did not find it necessary to base their decision on this ground, because on examination of the testimony of the witness the court found his answer to be responsive and within the general scope of the inquiry.

TORT by the members of a partnership engaged principally in the retail coal business with plants at Quincy and at Braintree for alleged slanderous words concerning the plaintiffs uttered by the defendant on February 3, 1903, when the defendant was the mayor of the city of Quincy and was testifying under oath before a committee of the General Court, causing injury to the plaintiffs in their business.   Writ dated February 6, 1903.

In the Superior Court the case was tried before *Hitchcock,* J. It appeared that the committee in question were appointed under an order passed by the Senate and the House of Representatives and were given the duties and powers which are described in the opinion.

Upon the evidence introduced by the plaintiffs the judge ordered a verdict for the defendant on the ground quoted in the first paragraph of the opinion. The plaintiffs alleged exceptions.

*G. R. Swasey & A. P. Worthen*, for the plaintiffs.

*P. R. Blackmur*, (*J. W. McAnarney* with him,) for the defendant.

HAMMOND, J. This is an action of tort for slander. The words were spoken by the defendant in testifying as a witness before a legislative committee. The judge ruled that "the alleged slanderous words having been uttered by the defendant as a witness, duly sworn, at a hearing before a committee of the Legislature, upon a matter within the authority of the committee, in response to a question asked of the witness by the chairman of the committee, and being pertinent to the matter then under investigation by the committee, are absolutely privileged, and the defendant is not liable in this action therefor; and directed the jury to return a verdict for the defendant."

The plaintiffs concede that it is the well settled doctrine, in this Commonwealth at least, that words spoken by a witness in the course of judicial proceedings which are pertinent to the matter in hearing are absolutely privileged, even if uttered maliciously. *Laing* v. *Mitten*, 185 Mass. 233, and cases there cited. They however contend that this doctrine is not applicable to the case of a hearing before a legislative committee, and in support of that contention they have addressed to us an argument based largely upon the well known facts that legislative committees are frequently composed entirely of persons who have no knowledge of rules of law, especially of those relating to evidence; that frequently neither public nor private interests are represented by counsel, and that as the natural result the whole proceedings relating to evidence are very loosely conducted. But notwithstanding these considerations we think that as stated by Field, J. in *Wright* v. *Lothrop*, 149 Mass. 385, 389, " the privilege of a witness appearing before a committee of the Legislature, in a matter within the jurisdiction of the committee, is undoubtedly the same as that of a witness in proceedings before a court of justice." This rule of privilege is a compromise between two important rights, the one being the right of

an individual to be free from attack by malicious words, and the other the right public and private of a thorough investigation when necessary by some tribunal before which the witnesses may speak without fear. The reason for the rule is applicable as much to a hearing before a committee of the Legislature as to one before a court.

The words in question were spoken before a duly constituted joint committee of the Legislature by the defendant who, having failed to answer one summons, was again summoned and, having appeared in answer to this command, was duly sworn as a witness. He testified therefore under the protection afforded by the rule.

The next contention of the plaintiffs is that the words used were not pertinent to the matter then under investigation. The committee was appointed while the community was suffering from the consequences of the great coal strike of 1902. The duties of the committee as expressed in the joint order under which it was appointed were " to investigate the conditions under which coal is received, supplied and sold in the city of Boston and vicinity. To ascertain if any attempt is being made, or has been made, to prevent coal from being transported to and delivered at its destination or placed on the market as speedily as it might be, and to determine whether the high prices at which coal is sold and has been sold are unavoidable or the result of an attempt on the part of the dealers, at wholesale or retail, to make excessive profits." Subsequently, before the hearing, the committee was ordered to extend the investigation " throughout the Commonwealth," and " to investigate and ascertain whether vessels or barges loaded with coal have been held or detained in harbors or at wharves for an unreasonable time before being unloaded."

It is very evident that the Legislature, in view of the state of things then and immediately theretofore existing in this community as to the lack of coal, was thoroughly aroused and, with a view to some legislation, was determined, if possible, to probe to the bottom the circumstances relating to the supply of coal. The order was very sweeping. Under it the committee properly could inquire into the conduct of every coal dealer in the Commonwealth, so far as it related to receiving, supplying or selling

coal, or holding or detaining or unloading coal barges at the harbors or wharves.

Under these circumstances the committee met. It fairly may be assumed that the members were determined in a matter so momentous to do their duty. The defendant, then the mayor of Quincy, who evidently had been quite active in his efforts to relieve the wants of the residents of that city as to coal,— a fact of which the committee apparently had had some information, — is called as a witness and duly sworn. In response to questions put to him by the chairman he gives his name and states that he is mayor of Quincy. Then the examination continues thus, the questions being put by the chairman:

" *Q.* Now the Committee understand that you have had some interesting experience in your efforts to secure coal for the people of Quincy and vicinity.

" *A.* I don't know whether they are interesting or not; we have had some experience.

" *Q.* The Committee would like to hear about it in your own way."

In response to this question the witness proceeds to make a long statement occupying several minutes.

Did he say anything not pertinent? " The examination of witnesses is regulated by the tribunal before which they testify, and if witnesses answer pertinently questions asked them by counsel which are not excluded by the tribunal, or answer pertinently questions asked them by the tribunal, they ought to be absolutely protected. It is not the duty of a witness to decide for himself whether the questions asked him under the direction of the tribunal are relevant. As the witness is sworn to tell the whole truth relating to the matter concerning which his testimony is taken, he ought also to be absolutely protected in testifying to any matter which is relevant to the inquiry, or which he reasonably believes to be relevant to it. But a witness ought not to be permitted with impunity to volunteer defamatory statements which are irrelevant to the matter of inquiry, and which he does not believe to be relevant. This statement of the law, we think, is supported by the decisions in this Commonwealth. The English decisions, perhaps, go somewhat further than this in favor of a witness; certainly they

apply the rule liberally for his protection." Field, J. in *Wright* v. *Lothrop*, 149 Mass. 385, 389, citing many authorities.

It is to be noted that the witness was replying to a statement from the chairman that the committee would like to have the witness state his experience in his " own way." Under these circumstances, the witness, as he went on, had the right to assume that if he stated anything not wanted by the committee he would be interrupted by the chairman ; and that, in the absence of any such interruption, he was giving the information for which the chairman asked, exactly as if the question had been more specific and the statements were made in answer thereto. If so, the statements being responsive to the question were pertinent within the meaning of the rule.

But we do not base our decision upon this ground. We have examined carefully the testimony and are struck with the strictness with which the witness in response to such a general question kept within the general scope of the inquiry. The statements which he made, if true, (and of that we cannot in this action inquire,) were plainly and directly pertinent to the subject before the committee. It is true that the word " blackmail " * is used, but it is perfectly apparent that it is used for the word " blacklist " and that, taken in connection with its context, the word is simply used by the witness as descriptive of certain facts which are fully detailed by him, and which if true are pertinent to the inquiry. The word is used in no other way. The ruling of the trial court was correct.

*Exceptions overruled.*

---

* The expressions referred to were used by the witness in commenting on certain rules of the New England Retail Dealers' Association, which the witness read to the committee. His language was as follows :

" Now, that means that this thing is what we call in our business — the paper business — blackmail, pure and simple. In other words, they can trace it right up from the people who shipped this car to somebody who wants to buy coal, and then they go to us as I shall show you later and find him."

" That means if a member has not done everything the association has told him to do, that he hasn't kept up the price of coal, he is dropped from the list ; everybody says you can't keep in the business — that is, they blackmail him right out of it, pure and simple."