Sherwood WEBSTER, Plaintiff,

v.

SUN COMPANY, INC., and Anthony L. Anderson, Defendants.

WEBSTER–HEISE CORPORATION, Plaintiff,

v.

SUN COMPANY, INC., and Anthony L. Anderson, Defendants.

Civ. A. Nos. 81–2867, 81–2868.

United States District Court, District of Columbia.

April 20, 1983.

Plato Cacheris, Larry S. Gondelman, Hundley & Cacheris, P.C., Washington, D.C., for plaintiffs.

John W. Nields, Margaret M. Zwisler, Washington, D.C., for defendants.

Stanley M. Brand, U.S. House of Representatives, for amicus curiae.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

These consolidated cases arise from the transmittal of an allegedly libelous memorandum to an official of the Congressional Research Service. The memorandum was created by an employee of defendant Sun Company and sent to various individuals within the company including defendant Anthony L. Anderson, who forwarded it to Congressional Research Service (CRS) official David M. Lindahl. It contained statements casting doubt upon whether an automobile fuel system device promoted by plaintiff Webster-Heise Corporation did all that it was promised to do and denouncing plaintiff Sherwood Webster, the corporation's president and the device's co-inventor, as, among other things, "unethical." Defendants have moved for summary judgment on the ground that the communication was protected by the common-law privilege for statements made to legislative bodies preliminary to a legislative proceeding. The joint leadership of the House of Representatives has filed an *amicus curiae* brief also arguing that the communication is privileged. As further support for their position, defendants also rely upon the

speech or debate clause of the Constitution and the right to petition guaranteed by the first amendment to the Constitution. Defendants alternatively have moved to dismiss the complaint of Webster-Heise Corporation on the ground that plaintiff has failed to allege special damages. For the reasons which follow, the defendants' motion for summary judgment shall be granted and the cause dismissed. Accordingly, the alternative motion to dismiss the corporate plaintiff's complaint need not be addressed.

The material facts are not in dispute. Plaintiff Webster is a self-taught amateur inventor. In late 1977 or early 1978 he and mechanic Richard Heise invented the octane-reducing valve hereinafter referred to as the Webster-Heise device. The device essentially is a fine mesh screen that is installed between the carburetor and the intake manifold of an automobile engine, that is, at the point in the fuel system before which the gasoline is mixed with air and after which the air-fuel mixture enters the cylinders for combustion. The principle of the device, stated elementarily, is that it will atomize the droplets of gasoline in the air-fuel mixture, thereby improving combustion. Webster claims that as a result, a car fitted with this device will be able to run without premature detonation (knocking) on gasoline ten octane numbers lower than normal, i.e., cruder and more cheaply refined grade of fuel than modern cars require. Webster expected the Webster-Heise Corporation to install the device in engines of its own manufacture, which would be sold to the major American car manufacturers.

Webster came to Washington, D.C. in September 1980 to promote his device to automobile manufacturers, oil companies, and various public officials. During that month, but before September 17, Webster sought and obtained a three-hour meeting with CRS analyst Lindahl and other CRS scientists. Webster made certain claims regarding the device and invited Lindahl to view a demonstration of the device in Denver, Colorado on October 15, 1980.

Defendant Anderson is a lobbyist for defendant Sun Company and has his offices in Washington, D.C. He met Webster for lunch on September 17, 1980, at which time Webster told him of the Webster-Heise device, which he said would reduce a car's octane requirements by 10 octane numbers. Webster invited Anderson to the Denver demonstration, and Anderson said that he would pursue the matter.

As it happened, on the same day Anderson had already been scheduled to meet with Lindahl to discuss another subject. Anderson had met with Lindahl on at least nine occasions over two and a half years to discuss energy issues. At the September 17 meeting when the subject of the Webster-Heise device came up, Lindahl expressed his interest in it and told Anderson that he was going to attend the Denver demonstration. Anderson advised Lindahl that he would try to persuade someone from the Sun Company to attend. However, no Sun employee attended. There happened to be a meeting of Sun personnel at Sun Company headquarters in Marcus Hook, Pennsylvania, scheduled for the same day.

Lindahl attended the demonstration, and at his next meeting with Anderson, on October 22, 1980, told him that he thought that the Webster-Heise device was "worthy of further discussion." Anderson Deposition, at 42. Lindahl subsequently continued to urge Anderson to interest the Sun Company in the device, and while Anderson attempted to interest Sun Company expert Walter Douthit in it, he was unsuccessful.

In mid-December 1980, Anderson received a copy of a memorandum written by Sun Company automotive engineering expert Harry Toulmin to his superiors at the Sun Company—the memorandum at issue in this action. The memorandum was not written in response to Anderson's inquiries. Instead, another Sun employee had heard about the device at a seminar and as a result Toulmin's superior wanted a report. Toulmin, who already knew something about Webster, checked into the device and wrote the memorandum. The memorandum was sent only to his three immediate

supervisors, but one of them sent a copy to Douthit, who forwarded it to Anderson.

The text of the memorandum is as follows:

> John Griffith sent me the report on the Pace Seminar and your question on the add-on device to reduce the octane requirement by 10 octane numbers. The device which they are referring to is the Webster-Heise device which is nothing but a screen cylinder with a solid bottom that moves up and down in the carburetor riser. The amount of screen exposed to the mixture is controlled by the engine manifold vacuum. The fuel air mixture flows through the screen and this is supposed to improve the distribution in the engine and allow a reduction in manifold heating.
>
> Devices like this have been around for ages. They will reduce octane requirement if they throttle the engine and some tests of this device indicate that the engine is throttled to 5″ Hg drop at full throttle. This, of course, results in a large power drop. One laborabory [sic] that I know of was asked to test it but after signing an agreement on how the tests should be run, Heise refused to let them make any direct comparisons.
>
> The device was invented by Heise and is being promoted by an unethical lawyer, Sherwood Webster. Webster was also the promoter of the Laforce engine a few years ago and he even objected to the tests that EPA ran on this engine as being biased and tried to get some of the EPA engineers fired. Unfortunately, Webster has a lot of friends in high places.
>
> It is interesting that Webster has not been to EPA for an evaluation of this device, under Section 511 of the Motor Vehicle Information and Cost Savings Act. A positive recommendation by EPA would assure him of a large market. Perhaps after the Laforce deal, he doesn't want to get caught again by comprehensive tests.
>
> I am not surprised that Pace was taken in by this demonstration. They know far more about refining than they do about engines.

Lindahl previously had indicated to Anderson that he thought Sun remiss in not taking a harder look at the Webster-Heise device. Anderson therefore sent Lindahl a copy of the memorandum, with a note reading "Thought this might interest you," because it contained technical data concerning a study of the device and confirmed that Sun Company experts had in fact investigated the device to some extent. This transmittal of the memorandum is the basis of this action. In his deposition, Anderson stated that he thought it would be helpful for Lindahl to have the views of Sun Company experts on the device and that he believed that Lindahl would want information both favorable and unfavorable to it inasmuch as Lindahl could investigate further to find the truth. Moreover, he expected that Lindahl would keep the memorandum confidential, since Lindahl had always been circumspect in the past in regard to disclosing information. Anderson Deposition at 91, 93. Lindahl did at some point contact Webster's lawyer, and then Webster, to determine whether the memorandum was accurate. Webster apparently did not ask for or obtain the memorandum from Lindahl at that time. Webster Deposition at 768–71.

Despite the statements contained in the memorandum, Lindahl thereafter arranged at least two meetings with governmental officials so that Webster could promote the device. Then in fall 1981, Lindahl told Webster that he had forwarded all of his documents on the device, including documents Webster had given him, to the House Science and Technology Committee (the Committee).

Thereafter the staff of the Committee's subcommittee on Investigations and Oversight (the subcommittee) contacted Webster and arranged three successive meetings with him to study the "barrier syndrome"—the idea that small companies have difficulty introducing their innovations into the market place because of corporate "barriers" to the acceptance of privately-devel-

oped inventions. Webster and the subcommittee staff discussed the merits of the Webster-Heise device and the difficulties he had encountered in promoting his inventions to "corporate America." In response to the subcommittee's inquiry as to examples of corporate resistance to his work, Webster noted the memorandum at issue in this case. Webster Deposition at 796. The subcommittee staff told him that they already were aware of the memorandum, having received it with Lindahl's other documents concerning Webster's device. The staff was unwilling to release the memorandum to Webster, so he obtained it from Lindahl and returned to discuss it with the subcommittee. Subsequently, Webster filed this lawsuit.

Lindahl published his findings concerning the Webster-Heise device in September 1982, in an official CRS report entitled "The Webster-Heise Valve: A Significant Improvement in the Internal Combustion Engine and Its Fuels." Exhibit to Second Supplement to Defendants' Motion (Lindahl Report). The report makes no reference to defendants or the memorandum; however, it does explore the issues raised by the technical criticisms in the memorandum. See, e.g., Lindahl Report at CRS 29 ("pressure drop from the presence of the screen could result in a power drop"). It also discusses the "barrier syndrome." See id. at CRS 7 to CRS 8 (speculation as to reasons why auto industry has not embraced the Webster-Heise device).

The Congressional Research Service, a department of the Library of Congress, was created by Congress in 1946. Its purposes and duties are set forth in 2 U.S.C. § 166(d). The CRS serves to provide Members of Congress and congressional committees with such information as analyses of legislative proposals, lists of current congressional programs, lists of topics committees at the opening of a new Congress "might profitably analyze in depth," and summaries and digests of bills and other legislative measures. Id. The CRS's mission also includes performing research and preparing information useful to Members of Congress and the committees either upon request or upon its own initiative. 2 U.S.C. § 166(d)(4, 5, 7). It exists to perform research and accumulate information continuously so that data may be available as needed by Congress. Accordingly, the CRS may engage in research on a subject that is not at the moment the subject of a legislative proceeding—the statute contemplates that its information gathering will extend to issues beyond those being discussed by Congress at the moment.

In arguing that the transmittal of the memorandum from Anderson to Lindahl is privileged, defendants rely upon the common law privilege for communications preliminary to legislative proceedings. Defendants also cite the speech or debate clause of Article I, section 6 of the Constitution and the petition clause of the first amendment to the Constitution in support of their argument.

1. *The Common Law Privilege*

At common law, defamatory statements made to a legislative body in connection with a legislative proceeding are absolutely privileged. That privilege is reflected in section 590A of the Restatement, Second, of Torts (1977), which provides that:

> A witness is absolutely privileged to publish defamatory matter as a part of a legislative proceeding in which he is testifying or in communications preliminary to the proceeding, if the matter has some relation to the proceeding.

That privilege is congruent to the privilege afforded witnesses before judicial proceedings, as set forth in section 588 of the Second Restatement. Restatement (Second) of Torts § 590A, comment a. The purpose of the privilege is to ensure that those providing information to a legislative or judicial body will not be inhibited from making full disclosure by the fear of private defamation actions. Restatement (Second) of Torts § 588, comment a. Communications need not be material or relevant to the inquiry before the legislative body before they may be privileged, nor need they be made in response to a ques-

tion, as long as they have some reference to the subject of the inquiry. *Id.,* comment c. Volunteered statements relevant to the inquiry are privileged. *Id.* Consistent with these principles, defamatory statements published in response to a question by a participant in the inquiry are necessarily within the privilege. *Id.* Indeed, to limit the privilege to communications directly responsive to a question would thwart the privilege's purpose in that it would render witnesses, uncertain as to what is and is not privileged, hesitant to provide information, and, to the extent that the limits of the privilege are discernable, deprive the examining body of useful and relevant information that is outside the precise bounds of the question. For the same reason, "communications preliminary to the proceeding" are expressly embraced by the privilege as defined in section 590A.

 Although no hearings were taking place concerning the questions of the utility of the Webster-Heise device or the barrier syndrome at the time the memorandum was transmitted from Anderson to Lindahl, this nevertheless was a "communication preliminary to a proceeding." No hearing or other formal "proceeding" need be in existence at the time of the communication for the privilege to apply. *See, e.g., Brody v. Montalbano,* 87 Cal.App.3d 725, 151 Cal.Rptr. 206, 211 (1978), *cert. denied,* 444 U.S. 844, 100 S.Ct. 87, 62 L.Ed.2d 57 (1979) (volunteered letter that initiated official inquiry privileged as "communication preliminary to a proceeding"). Certainly, a major purpose of the CRS is obtaining information that could be useful to Congress in future proceedings; as such, the policies behind the privilege set forth above apply to statements made to the CRS as well. Consequently, communications made to the CRS such as the memorandum at issue here are privileged if they have some relation to inquiries of the CRS within the scope of that agency's responsibilities to Congress as enumerated in 2 U.S.C. § 166(d). The remedy for a person defamed by such a communication to the CRS, therefore, is not money, but simply more speech—he has the right to tell his side of the story to the agency.

The memorandum sent to Lindahl was relevant not only to his official CRS inquiries, but ultimately to actual legislative proceedings as well. Lindahl had expressed to Anderson his interest in what the Sun Company was doing in regard to the Webster-Heise device; the transmittal of the memorandum was part of Anderson's response. There is no doubt that Lindahl's research into the Webster-Heise device was part of his official duties as a CRS investigator: the development of energy-conserving devices and the energy industry's receptiveness to inventions by outsiders certainly were topics of potential interest to Congress. Indeed, the memorandum found its way to a subcommittee of the House Science and Technology Committee, which considered it in its explorations of the "barrier syndrome." Moreover, as noted above, Lindahl presented his findings as to the utility of the device in an official CRS report. Accordingly, the transmittal of the memorandum falls within the common law privilege for communications to a legislative body.

### 2. Constitutional Considerations

 The CRS's information-gathering function is also affected by considerations of the speech or debate clause. The power of congressional inquiry is a part of the legislative process protected by the speech or debate clause. *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 504–05, 95 S.Ct. 1813, 1821, 44 L.Ed.2d 324 (1975); *McSurely v. McClellan,* 553 F.2d 1277, 1286–87 (D.C.Cir.1976) (*en banc*). Moreover, the protections of the clause extend to activities performed by congressional aides if such activities, were they performed by Members of Congress themselves, would be privileged. *McSurely v. McClellan,* 553 F.2d at 1284–85. In the proper case, this includes the "acquisition of knowledge through informal services"—which is the means by which Lindahl received the memorandum. *Tavoulareas v. Piro,* 527 F.Supp. 676, 680 (D.D.C.1981), quoting *McSurely v. McClellan,* 553 F.2d at 1287. As such, if applicable, this privilege would protect Lindahl's

receipt, rather than Anderson's transmission of the memorandum.

 In his well-reasoned opinion in *Tavoulareas,* Judge Gasch marked the limits of the speech or debate clause privilege as it applies to the formal and informal acquisition of information by congressional staff. The "mere passive receipt by congressional staff of information voluntarily proffered by various sources" is not within the privilege, since such is not "an integral part of the deliberative and communicative processes" in which congressmen participate in the course of considering legislation and other congressional activities. 527 F.Supp. at 680. Judge Gasch concluded that

> the finite limits [sic] of the speech or debate clause's shield, with regard to the information-gathering function of Congress, is the point at which congressional staff cease to be the active catalyst that induces the provision of particular information to Congress and become, instead, the passive recipient of information provided by an outside source at the source's own election.

*Id.* Some "active intervention by a congressional staff member inducing the provision of information in some manner" is necessary for such data to constitute information "acquired" pursuant to Congress' investigatory power. *Id.* at 680–81.

 In the case at hand, Lindahl was the "active catalyst" that prompted Anderson to supply the memorandum about the Webster-Heise device. Accordingly, Lindahl's receipt of the memorandum from Anderson was still well within the bounds of the speech or debate clause privilege as defined in the *Tavoulareas* opinion.

Unlike the speech or debate clause, which protects Congress' ability to acquire information, the right to petition of the first amendment is concerned with a citizen's ability to communicate information to Congress. However, as Anderson's communication of the memorandum to Lindahl is protected by the common-law privilege, whether it is protected by the right to petition as well need not be addressed here.

In light of the foregoing, defendants' motion for summary judgment shall be and hereby is granted and the cause dismissed. Accordingly, defendants' alternative motion to dismiss the complaint of plaintiff Webster-Heise Corporation shall be and hereby is dismissed as moot. A judgment consistent with this Memorandum Opinion and Order shall be entered this date.

SO ORDERED.