Sherwood WEBSTER, Appellant,

v.

SUN COMPANY, INC., et al.

WEBSTER–HEISE CORPORATION,
Appellant,

v.

SUN COMPANY, INC., et al.

Nos. 83–1592, 83–1593.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 14, 1983.

Decided March 23, 1984.

**2**

Plato Cacheris, Washington, D.C., with whom Larry S. Gondelman, Washington, D.C., was on the brief, for appellants.

John W. Nields, Jr., Washington, D.C., with whom Margaret M. Zwisler, Washington, D.C., was on the brief, for appellees.

---

Before TAMM and STARR, Circuit Judges, and J. SMITH HENLEY,[*] Senior Circuit Judge for the Eighth Circuit.

TAMM, Circuit Judge:

Appellants Sherwood Webster and the Webster-Heise Corporation contest the district court's summary judgment dismissing their libel claims. The district court found that the allegedly defamatory statements were protected by the common law privilege for communications preliminary to a legislative proceeding. Because the district court erred in defining the scope of the common law privilege, we vacate the summary judgment and remand for further proceedings.

### I. BACKGROUND

Sherwood Webster and Richard Heise invented a device that allegedly reduces the octane requirement of gasoline engines by allowing gasoline to burn more cleanly and efficiently.[1] On September 17, 1980, Mr. Webster promoted the device at a meeting with Anthony Anderson, Assistant Director for Government Relations for Sun Company. As part of his promotion, Mr. Webster invited Mr. Anderson to a demonstration of the device in Denver, Colorado, on October 15, 1980. Neither Mr. Anderson nor any other Sun employee, however, was able to attend the demonstration.

Mr. Webster also promoted the device to Mr. David Lindahl, an employee of the Congressional Research Service (CRS).[2] Mr.

---

[*] Sitting by designation pursuant to 28 U.S.C. § 294(d) (1976).

1. The district court described the device as

 a fine mesh screen that is installed between the carburetor and the intake manifold of an automobile engine .... Webster claims that ... a car fitted with this device will be able to run ... on gasoline ten octane numbers lower than normal, *i.e.,* cruder and more cheaply refined grade of fuel than modern cars require.

*Webster v. Sun Co., Inc.,* 561 F.Supp. 1184, 1186 (D.D.C.1983). The device is properly known as the "Webster-Heise Intake Manifold Variable Atomizing Valve" or the "Webster-Heise valve."

2. The Congressional Research Service (CRS) is an arm of Congress that collects and analyzes information for potential legislation. The CRS is authorized to gather and synthesize data bearing on legislation for congressional committees at the request of Congress or upon its own initiative. 2 U.S.C. § 166(d) (1982). *See also* 561 F.Supp. at 1188.

Lindahl attended the demonstration in Denver and returned enthused about Mr. Webster's invention. It happened that between September and December 1980 Mr. Lindahl and Mr. Anderson also met at least twice, though on energy matters unrelated to the Webster-Heise device. Mr. Lindahl mentioned to Mr. Anderson that he had been impressed by the Webster-Heise device and expressed some surprise that Sun Company had not given the device more attention. *Webster v. Sun Co., Inc.*, 561 F.Supp. 1184, 1186 (D.D.C.1983). As a result of Mr. Lindahl's favorable comments on the device, Mr. Anderson tried several times to interest a Sun research expert, but to no avail. Anderson Deposition at 30–35, 37, 39–40, 49; Brief for Appellees at 7.

Later in the fall of 1980, another Sun employee independently learned of the device. Harry Toulmin, a Sun Company automotive engineering expert, prepared a memorandum on the device and forwarded it to his supervisors. Mr. Anderson, though not by request, received a copy of this memorandum.[3] 561 F.Supp. at 1186. Mr. Anderson quickly reviewed the Toulmin memorandum, saw that it indicated Sun had done some research on the device, and forwarded a copy to Mr. Lindahl. *Id.* at 1187. Although Mr. Lindahl had not solicited Sun's opinion of the device, Mr. Anderson sent the memorandum, *inter alia*, "to show him that [Sun was] not as bad as he thought," and "that the interest that I had exhibited [in the Webster-Heise device] had fallen on deaf ears."[4] Anderson Deposition at 50, 76.

The Toulmin memorandum contained statements allegedly libeling Mr. Webster and disparaging his device. On November 25, 1981, Mr. Webster and the Webster-Heise Corporation each brought suit against Mr. Anderson and Sun Company for libel and disparagement of product.[5] Mr. Anderson and the Sun Company moved for summary judgment on May 3, 1983, arguing, in part, that the disputed statements were absolutely privileged. The privilege asserted derives from the common law privilege applicable to legislative proceedings, which includes communications *preliminary* to legislative proceedings as well as those made during the proceedings. Restatement (Second) of Torts §§ 588, 590A (1977).

The district court found that "[a]lthough no [relevant] hearings were taking place ... at the time the memorandum was transmitted ..., this nevertheless was a 'communication preliminary to a proceeding.'" 561 F.Supp. at 1189. The district court concluded more generally:

[C]ommunications made to the CRS such as the memorandum at issue here are

---

**3.** The Toulmin memorandum provides in pertinent part:

Devices like [the Webster-Heise device] have been around for ages. They will reduce octane requirement if they throttle the engine and some tests of this device indicate that the engine is throttled to 5″ Hg drop a full throttle. This, of course, results in a large power drop. One laborabory [sic] that I know of was asked to test it but after signing an agreement on how the tests should be run, Heise refused to let them make any direct comparisons.

The device was invented by Heise and is being promoted by an unethical lawyer, Sherwood Webster. Webster was also the promoter of the Laforce engine a few years ago and he even objected to the tests that EPA ran on this engine as being biased and tried to get some of the EPA engineers fired. Unfortunately, Webster has a lot of friends in high places.
561 F.Supp. at 1187.

**4.** Mr. Anderson's deposition includes the following exchange:

Q. Did ... the memorandum from Mr. Toulmin ... then arrive at your office unsolicited?
A. Yes, unsolicited.
Q. What did you do with [it] when you got [it]?
A. I just looked and saw that it had some data in there that indicated that maybe we had done something, so I whipped it off to Dave [Lindahl] to show him that we were not as bad as he thought.
Q. What do you mean by that?
A. That he thought that we were not doing our job.
Q. He thought you were remiss?
A. Yes, exactly, and I felt the same way.
Anderson Deposition at 50. *See also* Anderson Deposition at 64.

**5.** These actions were consolidated in the district court. The summary judgment of the consolidated action is here on appeal.

privileged if they have some relation to inquiries of the CRS within the scope of that agency's responsibilities to Congress as enumerated in 2 U.S.C. § 166(d). The remedy for a person defamed by such a communication to the CRS, therefore, is not money, but simply more speech—he has the right to tell his side of the story to the agency.

*Id.* Having found the disputed statements absolutely privileged, the district court issued summary judgment and dismissed appellants' claims of libel and disparagement of product.

Appellants contest the district court's definition of the common law privilege and its application of the privilege to the instant facts. We agree that the district court erred in defining the scope of the privilege for communications made to a legislative body. Moreover, we do not believe the district court made sufficient findings of fact for us to determine whether the disputed memorandum falls within the proper scope of the privilege. Accordingly, we vacate the district court's summary judgment and remand for further proceedings.

## II. THE COMMON LAW PRIVILEGE FOR UNSOLICITED COMMUNICATIONS TO A LEGISLATIVE BODY

■ The common law privilege for communications made to a legislative body is articulated in the Restatement (Second) of Torts § 590A (1977):

A witness is absolutely privileged to publish defamatory matter as part of a legislative proceeding in which he is testify-

ing or in communications preliminary to the proceeding, if the matter has some relation to the proceeding.

Most courts confronted with allegedly defamatory communications directed to a legislative body have adopted the approach taken by the Restatement. *See, e.g., Sheppard v. Bryant,* 191 Mass. 591, 78 N.E. 394 (1906); *Jennings v. Cronin,* 256 Pa.Super. 398, 389 A.2d 1183 (1978); *Logan's Super Markets, Inc. v. McCalla,* 208 Tenn. 68, 343 S.W.2d 892 (1961). The issue, however, of whether unsolicited statements made to the CRS are absolutely privileged seems to be one of first impression.[6]

In determining whether unsolicited statements to the CRS are privileged, we are guided by a well-settled common law principle: Grants of absolute immunity ought to be interpreted narrowly to serve only the purposes justifying the immunity. *See, e.g., Asay v. Hallmark Cards, Inc.,* 594 F.2d 692, 697, 698 (8th Cir.1979); *Bradley v. Hartford Accident & Indemnity Co.,* 30 Cal.App.3d 818, 825, 106 Cal.Rptr. 718, 721 (1973); *Matthis v. Kennedy,* 243 Minn. 219, 223, 67 N.W.2d 413, 417 (1954). The purpose of granting immunity to communications addressed to a legislative body was set forth in *Sherrard v. Hull,* 53 Md.App. 553, 558, 456 A.2d 59, 62, *aff'd,* 296 Md. 189, 460 A.2d 601 (1983):

In order for a democratic government to govern democratically, it is necessary that an atmosphere be created whereby facts may be freely presented to the governing legislative body. Without such a free-speaking environment, individuals might be discouraged from addressing their government.[7]

This rule of privilege is a compromise between two important rights, the one being the right of an individual to be free from attack by malicious words and the other the right public and private of a thorough investigation when necessary by some tribunal before which the witnesses may speak without fear. The reason for the rule is applicable as much to a hearing before a committee of the Legislature as to a court of justice.

The RESTATEMENT agrees that the same interests justifying immunity for statements made in judicial proceedings also underlie immunity for statements made in connection with legislative

---

**6.** In framing the precise legal question at issue, we refer to the disputed memorandum as "unsolicited." Although the parties disagree on whether Mr. Anderson's forwarding the memorandum was somehow "prompted" by Mr. Lindahl's earlier interest, it is settled fact that Mr. Lindahl did not *request* the disputed memorandum or any like information from Sun Company. Since the information was not explicitly requested but freely volunteered, it was "unsolicited" for the purposes of our examination.

**7.** *See also Sheppard v. Bryant,* 191 Mass. 591, 592–93, 78 N.E. 394, 400 (1906):

An individual must feel unrestrained by potential defamation liability when addressing the legislature. Only then can the lawmaking process be fully informed and operate with maximum effectiveness.

 We limit our definition of the privilege in this case to the context of unsolicited statements made to the legislature or its investigative arm. In tailoring the scope of the privilege, our ultimate objective must be to promote candid legislative input. At the same time, we must prevent overbroad applications of the privilege that would create a shelter from defamation liability. To achieve these goals, we reserve the absolute privilege for statements meeting the following two criteria. First, the communicator must show that he would not have made the unsolicited statement but for his intention to inform the legislative body on a subject properly within its jurisdiction.[8] Second, the statement must have some relation to the legitimate legislative business to which it is addressed.[9]

The first criterion ensures that the privilege promotes only those statements made solely to inform the legislative process.[10] If the unsolicited statement would have been made for purposes other than legislative input, the speaker would necessarily have been willing to incur the risk of defamation liability to have his say. In such

case, granting the privilege is not only unnecessary as an incentive, but also would cloak with a legislative privilege statements not meant only for the legislative body. It is just this kind of overbroad use of immunity denounced by the common law principle requiring privileges to be tailored closely to their justifications.[11]

 The second criterion requires some objective relation between the substance of the unsolicited statement and the legislative business to which it is addressed. This requirement also guards against overbroad application of the privilege. Legislative immunity is meant to encourage legitimate legislative input; it is not meant to insulate all statements, no matter how irrelevant to legislative business, that are channeled to the legislature. This is not to say, however, that the application of the privilege turns on the cogency of the disputed statement. The "some relation" requirement has been construed broadly precisely to avoid subjective judgments on the informative value of legislative input. *See generally Brown v. Collins*, 402 F.2d 209, 212 (D.C.Cir.1968); *Circus Circus Hotels, Inc. v. Witherspoon*, 657 P.2d 101, 104 (Nev. 1983). So long as the statement has some objective pertinence to the legislative issue it was meant to address, it meets the second part of the test.[12]

proceedings. RESTATEMENT, SECOND, OF TORTS § 590A comment a. Consequently, cases discussing immunity in the judicial context may help guide our examination of immunity in the legislative context.

**8.** It is particularly important when a statement is not specifically solicited to distinguish between statements meant only to inform a legislative proceeding and those made for other purposes. Since unsolicited statements are not restricted to the scope of a specific question, they may cover a broad range of issues. The danger of causing defamatory injury with impunity by publishing unsolicited statements to legislators is thus especially great. *See generally Brown v. Collins*, 402 F.2d 209, 213 (D.C.Cir.1968).

**9.** This privilege insulates statements made only to the legislature or its investigative arm. Publication to individuals not associated with the legislature and republication by the legislator are not covered by this privilege.

**10.** The communication may be meant, of course, either to initiate or discourage legislative action on a given issue.

**11.** The California Supreme Court, in discussing witnesses' immunity in the judicial context, emphasized that only those statements "made in furtherance of the litigation and to promote the interest of justice" are privileged. *Bradley v. Hartford Accident & Indemnity Co.*, 30 Cal. App.3d 818, 826, 106 Cal.Rptr. 718, 723 (1973) (emphasis omitted). *See also Brody v. Montalbano*, 87 Cal.App.3d 725, 733, 151 Cal.Rptr. 206, 211 (1978), *cert. denied*, 444 U.S. 844, 100 S.Ct. 87, 62 L.Ed.2d 57 (1979).

**12.** Appellees argue that the scope of this privilege should reflect precisely the immunity afforded legislators under the speech or debate clause of the Constitution. Appellees thus assert that if Mr. Lindahl is protected by the speech or debate clause, they also are protected by the common law privilege for comments directed to

■ The parties in this appeal have disagreed vigorously on the proper interpretation of the Restatement's admonition against overbroad grants of immunity to communications preliminary to a legislative proceeding:

> As to communications preliminary to a proposed ... proceeding, the rule stated in this Section applies *only when the communication has some relation to a proceeding that is actually contemplated in good faith and under serious consideration by the witness or a possible party to the proceeding.* The bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered.

Restatement (Second) of Torts § 588 comment e (1977) (emphasis added); *id.* § 590A comment a. In the context of *unsolicited statements* offered to the CRS, we believe the "contemplated in good faith" requirement promotes the purpose of the privilege

when directed at the *communicator.* Since the purpose of the privilege is to encourage candid legislative input, it is necessary that all privileged statements be "contemplated in good faith" and "seriously considered" to bear on potential legislative action. We thus read comment e in the context of this case to be entirely consistent with part one of the test outlined above. If an individual would not have forwarded a statement to the CRS but for his intention to influence potential legislative action, his efforts were necessarily "contemplated in good faith" to have legislative impact.[13]

The district court held that unsolicited comments made to the CRS are privileged so long as they relate to inquiries of the CRS "within the scope of that agency's responsibilities to Congress as enumerated in 2 U.S.C. § 166(d)." 561 F.Supp. at 1189. The district court thus appears to have focused on the second, "some relation," part of the test we outlined above.[14] The

a legislative body. This argument, however, focuses on Mr. Lindahl's actions and ignores Mr. Anderson's critical purpose in forwarding the memorandum. Since we will protect only legitimate legislative input, our focus in determining whether the privilege attaches must be on the *communicator,* not on the legislative recipient. The purpose and actions of Mr. Lindahl shed no light on whether Mr. Anderson would have sent the memorandum but for his intention to discourage legislative action on the Webster-Heise device. We therefore cannot accept appellees' suggestion that we tailor the common law privilege to match the boundaries of the constitutional speech or debate privilege.

Appellees also urge that the disputed memorandum is protected under the right to petition the government clause of the first amendment. Brief for Appellees at 40–42. The district court, however, explicitly reserved judgment on this point. 561 F.Supp. at 1190. It therefore is not an issue on appeal.

**13.** Appellants argue, somewhat cryptically, that immunity extends only to those statements made in connection with a CRS investigation requested by Congress. Brief for Appellants at 18–19. We find two flaws with this approach.

First, Congress has explicitly authorized the CRS to *initiate* investigations on issues it believes may be of interest to Congress. 2 U.S.C. § 166(d). Indeed, § 166(d) places investigations requested by Congress and those initiated by the CRS on exactly the same footing. It would thus run directly counter to the unambig-

uous text of § 166(d) to recognize only those investigations explicitly requested by Congress.

Even if, however, we were to read appellants' argument to require only that some official CRS investigation exist, whether initiated by the CRS or requested by Congress, we would still find it flawed. Requiring that some investigation already exist before immunity can attach does not promote the purpose of the privilege or guard against its abuse. The purpose of the privilege, as noted above, is to encourage candid legislative input. To grant immunity only to those statements made in connection with an already existing CRS investigation would severely limit the scope of possible input. It would also ignore a series of cases that have granted immunity to statements meant to *initiate* legislative or judicial action. *See Tiedemann v. Superior Court,* 83 Cal.App.3d 918, 927, 148 Cal.Rptr. 242, 247 (1978); *King v. Borges,* 28 Cal.App.3d 27, 35, 104 Cal.Rptr. 414, 417 (1972); *James v. Brown,* 637 S.W.2d 914, 916–17 (Tex.1982). Finally, requiring an investigation to be in progress would do little to guard against granting immunity to statements not meant to inform, or unrelated to, some legislative business.

**14.** It is unclear whether the district court meant to restrict the privilege to those statements relating to *already existing* CRS inquiries. For reasons stated, *supra* note 13, we do not believe that requiring a CRS investigation to exist before granting immunity either promotes the purposes of the privilege or guards against its

court did not consider whether the disputed memorandum would have been sent to the CRS but for Mr. Anderson's intent to inform the CRS on a subject properly within its jurisdiction. Consequently, we must conclude that the district court's legal definition of the scope of the disputed privilege was, at best, only half complete.

Additionally, the district court has not made sufficient factual findings for us to determine whether the memorandum falls within the proper scope of the privilege.[15] Appellants argue with some force that Mr. Anderson sent the memorandum to Mr. Lindahl not to inform the CRS, but to preserve the reputation of Sun Company. Specifically, appellants contend that Mr. Anderson was concerned that an important business associate would think that Sun had been remiss in not giving the device more attention. Brief for Appellants at 9–10, 18–19. This ambiguity concerning Mr. Anderson's purpose is underscored by the following excerpt from his deposition:

Q. Was this letter that you have testified to as having been sent to Mr. Lindahl an effort on your part to influence Mr. Lindahl in connection with the device that Mr. Webster invented?

A. No.

Q. You were not trying to influence him?

A. No. I was merely trying to prove to him that the interest that I had exhibited had fallen on deaf ears and that I really had tried. But you can see the result. That was the purpose, really.

Anderson Deposition at 75–76. *See also* excerpts cited *supra* note 4. Whether Mr. Anderson would have forwarded the memorandum but for the purpose of informing the CRS about the device thus remains an unresolved issue of material fact.[16]

### III. CONCLUSION

We are thus constrained to vacate the district court's summary judgment and to remand for further proceedings consistent with this opinion.

*It is so ordered.*

STARR, Circuit Judge, dissenting:

I respectfully dissent. In my view, the critical threshold issue resolved by the majority is whether the communication in question here was in fact unsolicited. Based upon the record evidence, the District Court concluded that the Congressional Reference Service ("CRS"), through Mr. Lindahl, had expressly indicated an interest in the Webster-Heise device and that the transmittal of the allegedly defamatory memorandum was part of the response of Sun Oil's Washington representative to this

---

abuse. We therefore do not incorporate such a requirement in our definition of the scope of the privilege for unsolicited statements made to the legislature or its investigative arm.

**15.** The district court did note that Mr. Anderson "thought it would be helpful [to Mr. Lindahl] to have the views of Sun Company experts on the device and that he believed that Lindahl would want information both favorable and unfavorable to it inasmuch as Lindahl could investigate further to find the truth." 561 F.Supp. at 1187. The court concluded that "Lindahl had expressed to Anderson his interest in what the Sun Company was doing in regard to the Webster-Heise device; the transmittal of the memorandum was part of Anderson's response." *Id.* at 1189. These findings were made, however, in the context of determining whether earlier communications by Mr. Lindahl "prompted" Mr. Anderson to forward the memorandum and whether the memorandum was related to a CRS inquiry. *Id.* The district court, therefore, has

not yet determined whether Mr. Anderson would have forwarded the memorandum but for his intention to inform the CRS about the device.

**16.** The district court seems to have determined that the content of the disputed memorandum had sufficient relation to the merits of the Webster-Heise device to pass the second, "some relation," part of the test. 561 F.Supp. at 1189. Thus, on remand, only the issue regarding Mr. Anderson's purpose in forwarding the memorandum may remain. Though this is an issue of fact, it is nonetheless to be resolved by the court since it involves the application of an absolute privilege. *See Circus Circus Hotels, Inc. v. Witherspoon,* 657 P.2d 101, 105 (Nev.1983) (determinations of whether statements are absolutely privileged are traditionally made by the court); *Mills v. Denny,* 245 Iowa 584, 589, 63 N.W.2d 222, 227 (1954) (same); *Devlin v. Greiner,* 147 N.J.Super. 446, 460, 371 A.2d 380, 388 (1977) (same).

expression of interest. In view of this specific factual finding, which is amply supported in the record, it is unwarranted to conclude that the memorandum was "unsolicited" simply because there was no specific request for it.

The importance of this factual determination by the District Court is fundamental. CRS was, in effect, carrying on a fact-gathering inquiry within the scope of its broad and varied duties under 2 U.S.C. § 166(d). Given the sweep of CRS' duties and the vital importance to the legislative process of CRS' gathering of information, I would conclude that the allegedly defamatory material was in fact submitted to CRS in the course of CRS' legitimate and appropriate activities or "proceedings." Where, as here, the material was supplied to CRS in response to an indication of its interest in the device, I would conclude, as did the District Court, that the communication enjoys the absolute privilege conferred by the common law. RESTATEMENT (SECOND) OF TORTS § 590A. Indeed, the majority admits that section 588 comment e of the Restatement, which addresses communications preliminary to a proceeding, applies only if the communication were unsolicited. Since in my view the communication was solicited, I see no need for a remand to conduct a subjective intent inquiry based upon the "contemplated in good faith" language of comment e.[1]

This position, grounded upon the specific factual determinations by the District Court, faithfully serves the policies which inform the Restatement's balancing of individual interests in being able to redress defamatory statements and the interests of legislatures in the full and free flow of information. In deference to the needs of the National Legislature, as evidenced by Congress' establishing CRS and conferring upon it a broad mandate to gather informa-

tion, I would not cabin the Restatement's privilege under the circumstances of this case. To do otherwise regrettably intrudes the judicial process into the vital task of Congress' obtaining information through the eyes and ears of CRS. Information and ideas are, of course, the very stuff of which legislation is born. We should, therefore, be quick to show deference under these circumstances to the needs of the coordinate branch of government most directly accountable to the people. I would, accordingly, affirm the judgment of the District Court.[2]

---

1. Moreover, even if I were to view the communication as unsolicited, I would still doubt the appropriateness of applying a subjective intent test derived from a comment which by its terms applies only to communications *preliminary to a proceeding.* In this case, CRS was actually engaged in an official proceeding, pursuant to its power to make inquiries on behalf of Congress. With respect to communications in an

extant proceeding, § 590A requires only that a communication have some relationship to a proceeding, regardless of the communicator's intent. That requirement is fully satisfied here.

2. In view of the foregoing analysis, I do not reach the Speech and Debate Clause issue raised by the appellee.