Sherwood WEBSTER, Appellant,

v.

SUN COMPANY, INC., et al.

**WEBSTER-HEISE CORPORATION, Appellant,**

v.

SUN COMPANY, INC., et al.

Nos. 85–5629, 85–5630.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 21, 1986.
Decided May 13, 1986.

Plato Cacheris, with whom Larry S. Gondelman, Washington, D.C., was on brief, for appellants.

John W. Nields, Jr., Washington, D.C., with whom Margaret M. Zwisler, Washington, D.C., was on brief, for appellees.

Before WRIGHT, EDWARDS, and BUCKLEY, Circuit Judges.

Opinion for the court filed by Circuit Judge WRIGHT.

J. SKELLY WRIGHT, Circuit Judge:

This is the second appeal of this libel action. The District Court initially found that defendants were protected by a common law privilege for communications to the legislature and dismissed the complaint. 561 F.Supp. 1184 (D.D.C.1983). On appeal a divided panel of this court found that defendants had not demonstrated all of the elements necessary to claim the privilege and remanded the case to the District Court. 731 F.2d 1 (D.C.Cir.1984). After a further evidentiary hearing the District Court once again dismissed the complaint on the basis of the common law privilege, Memorandum Opinion and Order filed March 29, 1985 (Mem.Op.), Record Excerpts (RE) 17, and plaintiff once again appeals. We affirm the District Court's decision to grant summary judgment for the defendant-appellees.

## I. BACKGROUND

Appellant Sherwood Webster is one of the inventors of a device, the Webster-Heise valve, that is said to improve the fuel

efficiency of automobile engines.[1] In the course of promoting his invention during a September 1980 trip to Washington, D.C., Webster met separately with (among others) appellee Anthony Anderson, a lobbyist for appellee Sun Company, Inc., and David Lindahl, an employee of the Congressional Research Service (CRS).

Lindahl was enthusiastic about the potential of the device and eventually published his favorable assessment in an official CRS report, "The Webster-Heise Valve: A Significant Improvement in the Internal Combustion Engine and Its Fuels." Lindahl expressed his enthusiasm to Anderson when they met on unrelated business, and Anderson tried unsuccessfully to interest other Sun Company officials in the device. Lindahl told Anderson that the device was "worthy of further discussion" and gently chided him about Sun's inaction.

Several months later Anderson received a copy of an internal Sun Company memorandum evaluating the Webster-Heise device. The evaluation was not a response to Anderson's inquiries; it was prepared at the request of another Sun executive who had heard about the device at a seminar. Although the memorandum was distributed to only a few corporate officials, it made its way through company channels to Anderson, who sent a copy to Lindahl along with a note saying, "Thought this might interest you."

The evaluation memorandum, written by Harry Toulmin, a Sun automotive engineer, was critical of both Webster and his invention. It said, in part:

Devices like this have been around for ages. They will reduce octane requirement if they throttle the engine * * *. This, of course, results in a large power drop. * * *

The device was invented by Heise and is being promoted by an unethical lawyer, Sherwood Webster. Webster was also the promoter of the Laforce engine a few years ago and he even objected to the tests that EPA ran on this engine as being biased and tried to get some of the EPA engineers fired. Unfortunately, Webster has a lot of friends in high places.

It is interesting that Webster has not been to EPA for an evaluation of this device, under Section 511 of the Motor Vehicle Information and Cost Savings Act. A positive recommendation by EPA would assure him of a large market. Perhaps after the Laforce deal, he doesn't want to get caught again by comprehensive tests.

RE 14.

In a deposition filed with the District Court, Anderson said he had no desire to influence Lindahl or Congress with respect to the merits of the Webster-Heise valve. Rather, Anderson said, he wanted to show Lindahl that he "really had tried" to interest his colleagues in the device.

The District Court dismissed Webster's action for libel and product disparagement. It held that the statements in the memorandum were protected by the common law privilege "reflected in section 590A of the Restatement, Second, of Torts." 561 F.Supp. at 1188.[2] On appeal a divided panel of this court held that *unsolicited* statements to Congress were privileged only when two conditions were met:

First, the communicator must show that he would not have made the unsolicited statement but for his intention to inform the legislative body on a subject properly within its jurisdiction. Second, the statement must have some relation to the legitimate legislative business to which it is addressed.

731 F.2d at 5 (footnotes omitted). The panel affirmed the District Court's finding of the necessary relationship to legislative business, but held that the "intention to

---

1. A more detailed description of the device appears at 561 F.Supp. 1186.

2. A witness is absolutely privileged to publish defamatory matter as a part of a legislative proceeding in which he is testifying or in communications preliminary to the proceeding, if the matter has some relation to the proceeding.

RESTATEMENT (SECOND) OF TORTS § 590A (1977).

inform" was unproven. *Id.* at 7. "Appellants argue with some force that Mr. Anderson sent the memorandum to Mr. Lindahl not to inform the CRS, but to preserve the reputation of Sun Company." *Id.* Accordingly, the case was remanded on this point. Judge Starr dissented.[3] 731 F.2d at 7–8.

On remand Anderson testified at an evidentiary hearing, and the District Court found that Anderson had sent the memorandum *both* to inform and to curry favor with the CRS. Since he could not have curried much favor without providing any useful information, the District Court concluded that Anderson would not have sent the memorandum "but for" an intention to inform. Consequently, the complaint was dismissed once again.

## II. COMMON LAW PRIVILEGE

### A. *Choice of Law*

The District Court and the previous panel of this court applied a common law privilege for communications to the legislature, "reflected in section 590A of the Restatement, Second, of Torts," 561 F.Supp. at 1188, but neither court explicitly grounded the privilege in the law of any particular jurisdiction. Although we ultimately conclude that the policy of the Restatement accurately "reflects" the applicable law, we think it is necessary to explain why District of Columbia law should govern this case.

■ Congress has not chosen to provide any specific level of protection for those who provide it with information. Moreover, because no "significant conflict between some federal policy or interest and the use of state law in the premises [has]

be[en] specifically shown," *Wallis v. Pan American Petroleum Corp.*, 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966),[4] this case is not an appropriate one for the creation of federal common law. *See Yip v. Pagano*, 606 F.Supp. 1566, 1569–1570 (D.N.J.1985); *Bio-Basics International Corp. v. Ortho Pharmaceutical Corp.*, 545 F.Supp. 1106, 1110–1113 (S.D. N.Y.1982). The appropriate state law should therefore provide the rule of decision.

■ In a diversity case such as this a federal court must apply the choice of law principles of the jurisdiction in which it sits. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496–497, 61 S.Ct. 1020, 1021–1022, 85 L.Ed.2d 1477 (1941); *Lee v. Flintkote Co.*, 593 F.2d 1275, 1278–1280 (D.C.Cir.1979). Under District of Columbia law, when there is conflict between the laws of two arguably relevant jurisdictions, we apply the law of the state that has the "more substantial interest in the resolution of the issue." *Fowler v. A & A Co.*, 262 A.2d 344, 348 (D.C.App.1970) (citations omitted); *see also Dovell v. Anne Arundel Supply Corp.*, 361 F.2d 543, 544 (D.C.Cir.1966).

■ Assuming, *arguendo*, that a conflict exists between the law of the District of Columbia and the law of Pennsylvania or Arizona,[5] we have no difficulty in concluding that the interest of the District of Columbia is more substantial. The memorandum at issue was prepared in the District of Columbia and transmitted (or "published") *only* in the District of Columbia by defendants who do business in the District of Columbia. Moreover, the entire episode

---

**3.** Judge Starr questioned whether the statement at issue in this case was truly "unsolicited" simply because there was no specific request for it, since Lindahl had expressed interest in the Webster-Heise valve and had urged Sun to investigate the device. Even if the memorandum were unsolicited, Judge Starr thought it was submitted to an ongoing official proceeding (*i.e.*, the CRS investigation) rather than "preliminary" to a proceeding. Moreover, Judge Starr saw no need to revise the "Restatement's balancing of individual interests in being able to redress defamatory statements and the interests

of the legislatures in the full and free flow of information." 731 F.2d at 8.

**4.** *Cf. Miree v. DeKalb County,* 433 U.S. 25, 32, 97 S.Ct. 2490, 2495, 53 L.Ed.2d 537 (1977) ("Actually the application of federal common law, as interpreted by the Court of Appeals here[,] would frustrate this federal interest *pro tanto* * * *.").

**5.** Webster is a citizen of Arizona. Sun is incorporated in Pennsylvania. Anderson's residence is not evident from the record.

was prompted by plaintiff Webster's significant promotional activities here.

Having concluded that the common law of the District of Columbia should control this case, we observe that the earlier panel's requirement of an "intention to inform" the legislature appears to have no basis in the common law of the District of Columbia,[6] and we doubt that it ever should have been applied. The District Court's original opinion, 561 F.Supp. 1184, seems to us much more consistent with the majority common law approach, embodied in the Restatement, that is typically followed by the District of Columbia. The intention test is nonetheless the law of this case, so we will apply it here.

### B. The District Court's Finding on Intention

The question of intention, as this court wrote in its earlier opinion, is an "issue of material fact." 731 F.2d at 7. The findings of the District Court on issues of fact must be affirmed by this court unless they are "clearly erroneous." Fed.R.Civ.P. 52(a).

On remand the District Court held a hearing at which Anderson was the sole witness. Anderson testified that he had forwarded the memorandum to Lindahl *both* because he wanted Lindahl to know that Sun had pursued the matter and because he thought that the information contained in the memorandum would be helpful to Lindahl and CRS. He said that because congressional aides "live on information and facts up there[,] our opinions are worthless, really. * * * If we hadn't done any work, he [Lindahl] wouldn't have been interested * * * [and] I wouldn't have sent it." Transcript at 16–17.

■ The District Court's opinion correctly distinguished Anderson's *intention* —what he meant to do—from his *motivation* —why he did it:

Like any other lobbyist [Anderson acted] with his employer's best interests in

mind: he hoped to rehabilitate the reputation of Sun. The presence of that underlying motive does not strip his communication of protection under the legislative process privilege; indeed, to narrow the scope of the privilege on that basis would drastically frustrate the objective of "promoting candid legislative input". 731 F.2d at 5. In the real world, altruism is not the rule: most persons providing input into the legislative process do so with some degree of self-interest.

Mem.Op. at 7, RE 23.

Notwithstanding Anderson's self-serving motive, the District Court found that "[t]he credible and convincing evidence demonstrates that Anderson's *intention* in forwarding the memorandum to Lindahl was to provide information that would be of value to the CRS in its investigation of the Webster-Heise devise." *Id.* at 6, RE 22 (emphasis added). We cannot say that this factual finding is clearly erroneous.

### III. CONSTITUTIONAL PRIVILEGE

■ Webster also argues that the "absolute" privilege of the common law cannot survive the Supreme Court's recent decision in *McDonald v. Smith*, — U.S. —, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985). In that case McDonald had sent a letter criticizing Smith, who was a nominee for the position of United States Attorney in North Carolina, to the President and several Members of Congress. Citing *White v. Nicholls*, 44 U.S. (3 How.) 266, 11 L.Ed. 591 (1845) (a privilege case decided under the pre-*Erie* federal common law), the Court held that the right to petition was sufficiently protected by North Carolina's "malice" rule—a rule akin to the one imposed by *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The constitutional protection of the right to petition does not *require* states to provide an absolute privilege for all communications with government.

The holding in *McDonald v. Smith* balances the need for free flow of information

---

**6.** "The issue * * * of whether unsolicited statements made to the CRS are absolutely privi-

leged seems to be one of first impression." 731 F.2d at 4.

to the government against the state's interest in protecting individuals from defamation. Webster argues that the same factors must be balanced in this case, and that by analogy the Supreme Court's reasoning on constitutional privilege should control the common law privilege.

> Given the essential equivalence in the goals of the right to petition and the common-law privilege as applied to unsolicited statements, it would be anomalous, indeed, for a common-law privilege to afford a greater degree of protection than a constitutional privilege.

Brief for appellants at 18.

 Sun distinguishes *McDonald v. Smith* in the first instance by noting that it involves a communication to the Executive Branch, and that such communications typically receive less protection at common law than communications with courts or legislatures. *Compare* RESTATEMENT (SECOND) OF TORTS § 598 *with id.* § 588 *and* § 590A. In any event, it is not particularly "anomalous * * * for a common-law privilege to afford a greater degree of protection than a constitutional privilege." The Constitution sets out the minimum protection for First Amendment rights, but it does not prohibit state law from providing a higher level of protection. *Cf. PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). As Anderson's memorandum to Lindahl is protected by the common law privilege, we

---

**7.** The District Court explicitly declined to address the issue for this reason. *See* 561 F.Supp.

need not decide whether it would be protected by the right to petition as well.[7]

 If Webster could point to a Supreme Court case that established intervening controlling authority on the limits of the privilege, we would be obligated to follow it. But it is not enough that, by analogizing to *McDonald v. Smith,* plaintiffs "could now make a more persuasive argument * * * than we would have thought likely when the case was last here." *Fogel v. Chestnutt,* 668 F.2d 100, 109 (2d Cir. 1981). Absent a clear change in the governing doctrine, we must follow the law of the case set down in the opinion of the earlier panel.

## IV. CONCLUSION

The District Court's conclusion that the "intention to inform" test was satisfied in this case is not clearly erroneous. Nothing in the holding of *McDonald v. Smith* compels us to weaken the common law privilege traditionally afforded to communications to the legislature. The District Court's judgment in favor of appellees Sun Company, Inc. and Anthony Anderson is therefore

*Affirmed.*