Richard VULTAGGIO, Plaintiff-Respondent,

v.

Caryl YASKO, Defendant-Appellant.

Supreme Court

*No. 96–0651. Oral argument September 3, 1997.—Decided January 16, 1998.*

(Also reported in 572 N.W.2d 450.)

For the defendant-appellant there were briefs (in the Court of Appeals and Supreme Court) by *James A. Friedman, Robert J. Dreps* and *LaFollette & Sinykin*, Madison and *Michael D. Brennan* and *Garczynski & Brennan Law Offices, S.C.*, Elkhorn and oral argument by *James A. Friedman.*

For the plaintiff-respondent there was a brief and oral argument by *Terry P. Race*, Whitewater.

¶ 1. JON P. WILCOX, J. This case is before the court on certification from the court of appeals following an order of the Circuit Court for Walworth County, Michael S. Gibbs, Judge, denying the defendant, Caryl Yasko's (Yasko) motion for summary judgment and her

subsequent motion for reconsideration. Yasko petitioned the court of appeals for leave to appeal the circuit court's order.

¶ 2. On certification, we consider whether Wisconsin law should afford an absolute privilege, or a conditional privilege, for witnesses testifying in legislative proceedings. We hold that under the circumstances presented here, such witnesses are not entitled to an absolute privilege. However, we do hold that testimony given under these circumstances is entitled to a conditional privilege. Therefore, we affirm the order of the circuit court denying Yasko's motion for summary judgment.

¶ 3. On October 18, 1994, the Whitewater City Council held a public meeting to consider, among other things, a recommendation of the Ad Hoc Municipal Building and Facilities Committee pertaining to the city's need for additional office and meeting space. The committee had recommended that the council accept a proposal which provided for an addition to the public safety building and increased space for the police and fire departments.

¶ 4. Ms. Yasko attended this meeting and testified in favor of a different proposal that would have remodeled a former middle school for the office space. She felt that renovating the middle school would reverse the "destabilization" of her neighborhood. During her testimony, Yasko highlighted her neighborhood's transition from family housing to college student housing, and openly criticized the upkeep of several buildings owned by the plaintiff, Richard Vultaggio (Vultaggio).[1] There is no evidence in the

---

[1] Referring to one home in the area, Yasko said "It's one of our pig sties. It was designed to house pigs. It's owned by Richard Vultaggio." Pertaining to another she announced, "[L]ast

record that Ms. Yasko was subpoenaed or invited[2] to appear at the meeting, that she was sworn under oath before testifying, or that she was directed in her testimony by questions from the council. The meeting was broadcast in its entirety on a local television station.

¶ 5. Approximately three months later, Mr. Vultaggio sued Ms. Yasko for defamation based on the statements she made during the city council meeting on October 18, 1994. Ms. Yasko moved for summary judgment, arguing that her statements before the Whitewater City Council were absolutely privileged, or in the alternative, that they were conditionally privileged without any abuse of that privilege. The circuit court denied her motion, holding that Yasko had failed to show the court that an absolute privilege extended to

year it was a pool hall, for pay. That belongs to Richard Vultaggio. He's real proud of our community. He respects the people who built those houses." Concerning still another, Yasko posed "Guess what? It belongs to Richard Vultaggio, the proud owner of this slum property. This house has been now three years with students and it's on its last stages. I call them parasites of the university." Finally, "for a further glimpse of the destabilization of our community," Yasko directed her audience's attention to "another sub-human habitation place" that was "owned by Richard Vultaggio."

[2] In both his briefs and at oral argument, counsel for the defendant maintained that Ms. Yasko was invited to the October 18, 1994, city council meeting to offer testimony. To the contrary, the only evidence in the record on this point suggests that Yasko was invited to an August 29, 1994, meeting held by the Ad Hoc Municipal Building and Facilities Committee. There is no evidence to suggest that the city council requested her attendance at the October 18, 1994, meeting that is the subject of this action, nor is there any evidence that she actually attended the August 29, 1994, meeting to which she was specifically invited.

speakers before city council meetings under current Wisconsin law. Upon motion for reconsideration, the circuit court held that such testimony is afforded neither an absolute, nor a conditional privilege in the state of Wisconsin. Ms. Yasko appealed the circuit court's non-final order.

## I.

¶ 6.  The issue that we address is a question of first impression in the state of Wisconsin: whether witnesses should be afforded an absolute privilege, or a conditional privilege, when testifying at legislative proceedings. This is a question of law to be decided without deference to the circuit court's conclusion of law. *See Kensington Development Corp. v. Israel*, 142 Wis. 2d 894, 899–900, 419 N.W.2d 241 (1988); *see also Rady v. Lutz*, 150 Wis. 2d 643, 647, 444 N.W.2d 58 (Ct. App. 1989).

¶ 7.  A communication is defamatory if it tends to harm the reputation of another so as to lower that person in the estimation of the community or deter third persons from associating or dealing with him or her. *See Zinda v. Louisiana Pacific Corp.*, 149 Wis. 2d 913, 921, 440 N.W.2d 548 (1989). "However, not all defamations are actionable. Some defamations fall within a class of conduct which the law terms privileged." *Id.* A complex structure of privileges has developed in the law to protect and advance the societal and individual interests in the free flow of ideas and information. *See* W. Page Keeton et al., *Prosser & Keeton on the Law of Torts*, § 114, at 815 (5th ed. 1984).

¶ 8.  Privileged communications are either absolute or conditional. *See Lathan v. Journal Co.*, 30 Wis.

2d 146, 151–52, 140 N.W.2d 417 (1966). The defendant asks us to adopt the Restatement standard for absolute privilege in legislative proceedings, whereby a witness's statement is subject to only two restrictions: it must be made as "part of a legislative proceeding," and it must have "some relation to the proceeding." Restatement (Second) of Torts § 590A (1977).[3] Once a statement has met these two standards, the witness is clothed with complete immunity from liability, even if the witness is motivated by malice or ill will toward the plaintiff and knows the statement to be false. *See Lathan*, 30 Wis. 2d at 151; *see also Zinda*, 149 Wis. 2d at 922 ("Absolute privileges give complete protection without any inquiry into the defendant's motives.").

¶ 9.   A conditional privilege, on the other hand, is not absolute and may be forfeited if the privilege is abused. *See Zinda*, 149 Wis. 2d at 924 (citing *Ranous v. Hughes*, 30 Wis. 2d 452, 467, 141 N.W.2d 251 (1966)); Restatement (Second) of Torts § 599 (1977). The Restatement lists five conditions which may constitute an abuse of the privilege, and the occurrence of any one causes the loss of the privilege. *See Zinda*, 149 Wis. 2d at 924–25. The privilege may be abused, (1) because of the publisher's knowledge or reckless disregard as to the falsity of the defamatory matter (*see* §§ 600–602); (2) because the defamatory matter is published for some purpose other than that for which the particular privilege is given (*see* § 603); (3) because the publication is made to some person not reasonably believed to

---

[3] The Restatement (Second) of Torts § 590A (1977) provides:

> A witness is absolutely privileged to publish defamatory matter as part of a legislative proceeding in which he is testifying or in communications preliminary to the proceeding, if the matter has some relation to the proceeding.

be necessary for the accomplishment of the purpose of the particular privilege (*see* § 604); (4) because the publication includes defamatory matter not reasonably believed to be necessary to accomplish the purpose for which the occasion is privileged (*see* § 605); or (5) the publication includes unprivileged matter as well as privileged matter (*see* § 605A).

¶ 10. In determining whether to apply an absolute or conditional privilege to legislative proceedings, we are faced with a conflict between two American principles equally regarded in the law: the right of an individual, on the one hand, to enjoy his reputation unimpaired by defamatory attacks, and on the other hand, the necessity in the public interest of a free and full disclosure of facts in the operation of government. *See* Van Vechten Veeder, *Absolute Immunity in Defamation: Judicial Proceedings*, 9 Colum. L. Rev. 463, 463 (1909). *Compare Schier v. Denny*, 12 Wis. 2d 544, 550–51, 107 N.W.2d 611 (1961) (fostering the free filing of complaints with administrative agencies outweighs private right to compensation) *with Ranous*, 30 Wis. 2d at 466–67 (protecting private citizens from defamation outweighs need to insulate school board members from liability).

¶ 11. The parties rely heavily upon these countervailing proclamations of public policy. Ms. Yasko argues that the same policy supporting the extension of absolute privilege to parties, witnesses and their counsel in judicial proceedings compels its application to legislative proceedings. *See Bussewitz v. Wisconsin Teachers Ass'n*, 188 Wis. 121, 127, 205 N.W. 808 (1925). In *Bussewitz*, we stated:

> If parties are shadowed by the fear that by some mistake as to facts or some excess of zeal, or by some

error of counsel, they may be subjected to harassing litigation in an action for slander or libel, they may well feel that justice is too dearly bought and that it is safest to abandon its pursuit.

*Id. See also* Restatement (Second) of Torts § 590A cmt. a (1977) ("The absolute privilege of witnesses in legislative hearings and other legislative proceedings is similar in all respects to that of witnesses in judicial proceedings. . . ."). Yasko contends that the risk of uncompensated reputational harm from even false and malicious testimony is outweighed by the strong public policy of encouraging citizen participation in legislative proceedings.

¶ 12.    On the other hand, Mr. Vultaggio asks us to recognize that the right to use the judicial system for redress will be significantly impaired if an absolute privilege is extended to witnesses testifying at legislative proceedings. According to the plaintiff, the policy of protecting citizens from having their private or professional reputations damaged outweighs the concern for inhibiting the free exchange of views on legislative issues.

## II.

¶ 13.    It is against this background of public policy that we make our decision. We now consider the application of an absolute privilege to statements made at legislative proceedings such as the city council meeting at hand. First, however, it will be helpful to examine how far we have previously gone to bestow the absolute privilege upon otherwise actionable public statements.

## A.

¶ 14. The law of absolute privilege is not new to the state of Wisconsin. Where the statements bear a proper relationship to the issues addressed, we have extended the absolute privilege to the statements of parties, witnesses and their counsel in judicial proceedings. *See Bussewitz*, 188 Wis. at 127; *see also Spoehr v. Mittelstadt*, 34 Wis. 2d 653, 661, 150 N.W.2d 502 (1967) (statement by counsel in pre-trial conference absolutely privileged); *Calkins v. Sumner*, 13 Wis. 215, [*193], 220–21, [*198] (1860) (witness statements at trial absolutely privileged); *Jennings v. Paine*, 4 Wis. 372, [*358], 375, [*360–61] (1855) (counsel's statements to jury regarding witness absolutely privileged).

¶ 15. We have also extended the absolute privilege to participants in quasi-judicial and investigatory proceedings, such as statements made to a grand jury or to a district attorney relating to matters pending for grand jury investigation, *see Bergman v. Hupy*, 64 Wis. 2d 747, 221 N.W.2d 898 (1974), statements made to a real estate broker's board, *see Schier*, 12 Wis. 2d 544, and petitions to a governor for removal of a sheriff, *see Larkin v. Noonan*, 19 Wis. 93 (1865). Whether witnesses should be afforded an absolute privilege for statements made while testifying at legislative proceedings is, as we have indicated, a question of first impression in this state.[4]

---

[4] Citing *Zinda*, counsel for the defendant contends that we have explicitly recognized that an absolute privilege extends to legislative proceedings. *Zinda v. Louisiana Pacific Corp.*, 149 Wis. 2d 913, 922, 440 N.W.2d 548 (1989) ("[The absolute] privilege has been extended to judicial officers, legislative proceedings, and to certain governmental executive officers."). We are not persuaded that this statement should have any bearing on the decision that we reach today. The decision ren-

¶ 16. However, other states have explicitly addressed this question. The defendant cites case law from multiple jurisdictions to support her contention that courts throughout the country recognize the absolute privilege for a witness's testimony at legislative proceedings. We now address those claims.

### B.

¶ 17. Whether the privilege applicable is absolute or conditional requires an analysis of the particular situation involved. *See Bergman*, 64 Wis. 2d at 749. Here we must decide whether to extend an absolute privilege to Ms. Yasko's statements before a city council meeting, when there is no evidence to suggest that she was subpoenaed to testify, sworn under oath or that she was responding to particular questions posed by the council members. We make this decision knowing full well that the occasions upon which freedom of speech is placed at so high a value are "few in

dered in *Zinda* did not rely upon an absolute privilege—a fact made apparent by the sentence immediately following that cited by counsel: "The arguments in this case, however, are concerned only with conditional privilege." *Id.* at 922. Moreover, the sentence referred to by counsel cites *Prosser and Keeton on Torts*, indicating that we were simply commenting on the state of the law generally, not necessarily that in Wisconsin. Finally, the dicta in *Zinda* did not specify whether the absolute privilege is afforded to statements made by members of legislative bodies, or witnesses appearing before them. This distinction is an important one. *See* Wis. Const. art. IV, § 16 (members of legislature not liable for words spoken in debate); Restatement (Second) of Torts § 590 (1977) (member of state or local legislative body absolutely privileged to publish defamatory matter concerning another in performance of his legislative functions); 50 Am. Jur. 2d *Libel and Slander* §§ 294–295 (1995).

number and quite exceptional in character" and should be "fixed with some hesitation." Veeder, 9 Colum. L. Rev. at 463.

¶ 18. Although many states have extended an absolute privilege to legislative proceedings, they have often done so under circumstances that are remarkably different from the present situation. *See, e.g., Kelly v. Daro,* 118 P.2d 37 (Cal. Dist. Ct. App. 1941) (absolute privilege extended to witnesses subpoenaed to testify by reading from books produced under subpoena *duces tecum* who answered specific questions posed by legislative committee); *Sheppard v. Bryant,* 78 N.E. 394 (Mass. 1906) (absolute privilege extended to summoned witness's duly sworn testimony given in response to question asked by chairman of legislative committee).

¶ 19. However, several states have held that a witness's testimony before legislative bodies is absolutely privileged regardless of such considerations. For example, New Jersey courts have explicitly held, both at the federal and state levels, that the absolute privilege applies even when a witness is not subpoenaed to appear and gives unsolicited, unsworn testimony that does not respond to particular questions of the legislative bodies. *See Yip v. Pagano,* 606 F. Supp. 1566 (D.N.J. 1985) (testimony before House Subcommittee on Crime), *aff'd,* 782 F.2d 1033 (3d Cir. 1986); *DeSantis v. Employees Passaic County Welfare Ass'n,* 568 A.2d 565 (N.J. Super. Ct. App. Div. 1990) (testimony before advisory commission of town board).

¶ 20. Other states have employed similar reasoning. *See, e.g., North Coast Cable Ltd. Partnership v. Hanneman,* 648 N.E.2d 875 (Ohio Ct. App. 1994) (witness not subpoenaed to appear before committee of city council, but who received letter asking him to appear

afforded absolute privilege); *Jennings v. Cronin*, 389 A.2d 1183 (Pa. Super. Ct. 1978) (possible lack of subpoena irrelevant in determination that testimony before legislative committee absolutely privileged); *Logan's Super Markets, Inc. v. McCalla*, 343 S.W.2d 892 (Tenn. 1961) (voluntary appearance before committee of Tennessee legislature absolutely privileged).[5]

¶ 21.    Just as these states have done, the defendant invites this court to extend an absolute privilege to statements made at a city council meeting where she and the other members of the audience were allowed to speak at their own discretion, without the compulsion of a subpoena, without the control of having their testimony sworn and without the supervision of direct questions from the council.

## C.

¶ 22.    We decline the invitation to stretch the absolute privilege to such lengths. "[T]he effect of an absolute privilege is to give lavish support to the social interest in obtaining complete disclosures of facts from witnesses, and to ignore completely the predicament of the maligned and remediless individual whose reputation may be harmed." Ysrella Weinblatt, Case Note, 15 S. Cal. L. Rev. 276, 277 (1942). We are troubled by the

---

[5] Several other states to which the defendant refers have been less precise as to the factual basis for their decisions. *See, e.g., Joseph v. Collis*, 649 N.E.2d 964 (Ill. App. Ct. 1995) (statements made by private citizen before finance committee meeting of city council are absolutely privileged); *Domestic Linen Supply & Laundry Co. v. Stone*, 314 N.W.2d 773, 777 (Mich. Ct. App. 1981) (members of city administration who made statements concerning matters "about which the officials were called upon to comment" at a legislative session were entitled to absolute privilege).

fact that in a situation with little guidance, structure or control for the witness's testimony, an absolute privilege eliminates a defamed citizen's right of redress, despite the falsity of the statements, and the malice or ill will of those who make them.

¶ 23. Although not dispositive to our holding, we find this result particularly inequitable where, as here, the statements are published immediately to the surrounding community—not only to those who choose to attend the meeting, but to anyone who might watch television that evening. The flow of information in today's society is virtually unimpeded—so much so that scurrilous lies and defamatory statements can be heard instantaneously by the public, regardless of whether the community deliberately seeks out that information. Such a powerful weapon can be lethal in the hands of one who chooses to defame.

¶ 24. At oral argument, counsel for defendant set forth at least five reasons why our concerns are unwarranted in this instance: (1) the requirement that the statement have "some relation to the proceeding" affords sufficient protection to those who might be defamed; (2) the plaintiff may testify at the same legislative proceeding or at a later meeting to rebut the testimony; (3) the plaintiff may choose to write letters to editors or city council members to rebut the testimony; (4) the legislative body has the authority and duty to control the meeting; and (5) the credibility of speakers is at stake to deter them from defaming others. We will address these arguments in turn.

¶ 25. Should we afford an absolute privilege to testimony of this sort, anything goes. Only two prerequisites must be satisfied in order to meet the Restatement standard for absolute privilege: the statements must be part of a legislative proceeding, and

they must "relate to" the substance of that proceeding. Restatement (Second) of Torts § 590A (1977). We have explicitly held that the "relevancy" standard for absolute privilege is to be liberally construed, and that all doubts must be resolved in favor of relevancy. *See Spoehr*, 34 Wis. 2d at 661–63 (statement relevant to the proceedings if the remark has "any pertinence, no matter how remote"); *Bussewitz*, 188 Wis. at 125.

¶ 26.    Undaunted, the dissent also contends that "the liberal relevancy test is not a superficial doctrine providing no protection to the allegedly defamed." Dissent at 356. The following example will help clarify why we are not persuaded: if the Whitewater City Council had met that evening to discuss different ways to improve and beautify the city, a city resident would be completely without redress if a witness falsely and maliciously accused the resident of owning and operating a child pornography business, or of selling drugs from his or her home.

¶ 27.    Pursuant to the dissent's rationale, the witness could continue this line of testimony by alleging that his or her neighbor is a prostitute, a sexual predator, or even a pedophile—all in the name of "improving" or "cleaning up" the city of Whitewater. In this example, the statements would be part of a legislative proceeding, and under any court's interpretation, would almost certainly "relate to" the subject matter of the meeting. *See Snow v. Koeppl*, 159 Wis. 2d 77, 81, 464 N.W.2d 215 (Ct. App. 1990) (relevancy requirement is a question of law for the court). Permitting such a result is not only bad public policy, but also defies common sense. Therefore, the "relate to" provision of the Restatement does little to assuage our fears.

¶ 28.    The next two arguments are equally unpersuasive. Rebuttal testimony often affords the injured

party little relief. As soon as the defamatory matter has been circulated, the damage has been done, regardless of counterattacks that may be made in the future. This is particularly true where, as here, the plaintiff is not present at the meeting to hear the accusations against him. Testimony at a later meeting may not be possible if that subject is not addressed again, letters to editors may not be published and are not certain to reach the defamed party's intended audience, and letters to the city council members would do little to restore the injured party's reputation throughout the remainder of the community. In any event, we decline to hold that a defamed person's only form of relief is to wait for an opportunity to clear his or her name in the public eye.

¶ 29.   The defendant next argues that just as a judge controls the nature and scope of testimony in a judicial proceeding, so too does the presiding official at a city council meeting of this sort keep a "tight rein" on the testimony and debate. We disagree. In a judicial proceeding, witnesses will be sworn under oath, will be directed by questions from counsel and can be reined in by the judge should they stray from the subject at hand. *See* Veeder, 9 Colum. L. Rev. at 471 ("Jurors, witnesses, counsel and parties litigant who overstep the bounds of decorum may be reprimanded, fined or punished by imprisonment, and the defamatory utterance may be expunged from the record."). Furthermore, witnesses in judicial proceedings would face perjury charges should they lie before the court, and can be held in contempt should they persist in their uncooperative ways.

¶ 30.   Here we find no evidence of such control by the Whitewater City Council. Ms. Yasko appears to have spoken at the meeting without any supervision from the council itself. There was no fear of punish-

ment should she lie, she was not sworn to tell the truth, nor was her testimony limited by questions from members of the council. Should we afford Ms. Yasko's statements an absolute privilege, the last conceivable restraint on her testimony would disappear when she approaches the podium to make her "relevant" statement, no matter how attenuated it might be. Although it is clear that some legislative bodies may have the authority and duty to control legislative hearings, the controls present under these circumstances were not enough to warrant adoption of the absolute privilege.

¶ 31. This proceeding was also different from a quasi-judicial proceeding. "[I]t is true that there seems to be 'no clear definition' of what constitutes a quasi-judicial proceeding before a quasi-judicial body," *DiMiceli v. Klieger*, 58 Wis. 2d 359, 365, 206 N.W.2d 184 (1973) (citation omitted), yet it is apparent that we often extended an absolute privilege to quasi-judicial proceedings because protections similar to those offered in judicial proceedings ensured the pertinency and propriety of the testimony before such bodies. *See Schier*, 12 Wis. 2d at 551; *Larkin*, 19 Wis. at 98–99; *see also* Note, *Defamation—Absolute Privilege in Administrative Proceedings*, 97 U. Pa. L. Rev. 877, 879, 880–83 (1949) ("though [it is] seldom expressly articulated," the adequacy of procedural safeguards which will minimize the occurrence of defamatory statements is a factor used in many cases to determine whether to grant or withhold absolute privilege); Nedwyn R. Nelkin, Recent Case, 13 Mo. L. Rev. 320, 321 (1948) ("Invariably, the extension of the rule of absolute privilege to most quasi-judicial bodies is said to be based upon the same considerations as exist in strictly judicial proceedings."). *Compare Bergman*, 64 Wis. 2d 747 *with State v. Peterson*, 195 Wis. 351, 359, 218 N.W. 367

(1928) (in investigation of alleged offense, district attorney holds a position analogous to judge who presides at trial because he must consult those who know the facts and thereby determine what course to pursue).[6]

¶ 32. Applying the cases and commentary to the situation at hand, we are therefore convinced that the Whitewater City Council meeting was sufficiently distinct from a quasi-judicial proceeding as to withhold the absolute privilege. The proceeding involved here is

---

[6] Contrary to the dissent's position, we do not assert that the absolute privilege has been adopted in the judicial/quasi-judicial context because the witness was always subpoenaed, sworn to tell the truth and was channeled by questions from the supervising body. Instead, we illustrate that a fundamental basis for extending the absolute privilege to witnesses testifying at judicial or quasi-judicial proceedings is that alternate protections of a judicial or quasi-judicial nature, such as those we highlight today, exist so as to satisfy the judiciary that its grant of complete and total immunity is appropriate. *See, e.g., Schultz v. Strauss*, 127 Wis. 325, 329 (1906) ("The proceedings of a grand jury are unquestionably judicial in character. . . ."); *Calkins v. Sumner*, 13 Wis. 215, [*193], 220–21, [*197–98] (1860) (witness "not answerable in damages for any statements he may make which are responsive to questions put to him. . . . [Witnesses] may be compelled to attend and give evidence, and when duly notified, the law makes it their unavoidable duty to do so; and to make them responsible in damages. . .for such obedience to a legal requirement, would be a most wicked and intolerable outrage."); William H. Bezold, Comment, *The Privilege Barring Civil Liability for Libel in Pleadings*, 36 Marq. L. Rev. 299, 300 (1953) ("A judicial proceeding is not limited to trials of civil actions, but includes within its scope all proceedings in law *of a judicial nature* either before a court or a tribunal *having judicial or quasi-judicial powers*.") (citing *Larkin v. Noonan*, 19 Wis. 93 (1865)) (emphasis added).

even difficult to compare to a legislative hearing in which the witness might be subpoenaed to testify, would be sworn under oath, and would be controlled by the direction of questions from the legislative body.

¶ 33.  Finally, counsel for defendant asserts that the risk a speaker faces of losing his or her credibility will serve as a deterrent to defaming others. This argument is perhaps the most troublesome. In today's society, more focus is typically placed on the accusations that are in circulation than the individuals who originally set them in motion. As a result, the speaker's credibility will often remain totally unscathed, even in the face of shameless and offensive lies. In a society where personal accountability has diminished, we find it less than comforting to leave such responsibility in the hands of those who wield the power to defame.

¶ 34.  These considerations lead us to conclude that, under these circumstances, any "chilling effect" upon a citizen's participation in the legislative process that might result without the exhaustive protection of an absolute privilege cannot outweigh a citizen's right to redress. "For while society is reaping a doubtful benefit from immunizing a malicious slanderer from suit, some individual whose reputation has suffered has been deprived of a remedy for the wrong done him." Weinblatt, 15 S. Cal. L. Rev. at 278. Therefore, we decline to adopt the absolute privilege for witness testimony at legislative proceedings of this sort.[7]

---

[7] A persistent theme of the dissent is that we employ reasoning that contradicts Wisconsin's jurisprudence in the area of privileged communications. "The majority misses the mark because it analyzes the case not in terms of whether policies supporting an absolute privilege exist, but rather in terms of whether certain safeguards such as subpoena, sworn testimony, and supervision exist." Dissent at 350. Therefore, the dissent

## III.

¶ 35.  However, we conclude that testimony at a legislative proceeding of this sort is deserving of a conditional privilege. We therefore adopt the conditional privilege ("abuse of occasion") test as set forth in *Zinda v. Louisiana Pacific Corp.*, 149 Wis. 2d at 924–25.[8] In doing so, we provide protection for an individual who may be defamed at a legislative proceeding which lacks

---

contends that we have adopted a new approach to privilege law. We disagree.

In its myopic focus on the safeguards that we highlight today, the dissent fails to realize that we explicitly engage in the public policy analysis that has characterized our privilege jurisprudence to date. Due to the lack of procedural safeguards in this case, however, we conclude that the public policy favoring a citizen's right to redress outweighs the policy concerned with discouraging a citizen's participation in the democratic process. Contrary to the dissent's position, all public policy determinations are affected by the facts of a particular case; the facts of this case were simply insufficient to warrant the adoption of an absolute privilege.

Indeed, a close examination of these issues reveals that our approach to privilege law is less troubling to the dissent than the actual difference in result. The dissent would have us adopt an across-the-board absolute privilege rule for all legislative proceedings, regardless of the facts of each individual case. Dissent at 349. Much to the contrary, we decline to ignore the facts of the case before us in determining whether to adopt the absolute privilege at legislative proceedings.

[8] *Zinda* involved the common interest privilege in the employer-employee context. *See Zinda v. Louisiana Pacific Corp.*, 149 Wis. 2d 913, 922–24, 440 N.W.2d 548 (1989); *see also* Restatement (Second) of Torts § 596 (1977). Therefore, we rely upon *Zinda* in this decision only to the extent that it employed the Restatement standard for the abuse of a conditional privilege.

sufficient protections to ensure that a witness's testimony remains relevant and appropriate.

¶ 36. In *Zinda*, we expressly adopted the most recent version of Restatement (Second) of Torts §§ 600–605A (1977) to determine whether a conditional privilege has been abused, and we do so again today. *See Zinda*, 149 Wis. 2d at 925 n.1. Doing so will avoid confusion over previously inconsistent applications of the conditional privilege test, which often included considerations of "malice" or "good faith without malice." *Compare Bergman*, 64 Wis. 2d at 749, 751 *and Hett v. Ploetz*, 20 Wis. 2d 55, 59, 121 N.W.2d 270 (1963) *with Hartman v. Buerger*, 71 Wis. 2d 393, 398, 238 N.W.2d 505 (1976) (referring to such considerations but acknowledging disapproval of the word "malice") *and Ranous*, 30 Wis. 2d at 468 (criticizing and avoiding use of the term "malice").

¶ 37. Therefore, a witness's testimony at legislative proceedings such as the city council meeting involved here will be conditionally privileged when the statements are made during that proceeding. However, as we have stated, the witness's privilege may be forfeited if any of the following occur: (1) the witness knows the defamatory matter to be false, or acts in reckless disregard as to its truth or falsity (*see* Restatement (Second) of Torts §§ 600–602 (1977)); (2) the defamatory matter is published for some purpose other than that for which the particular privilege is given (*see* § 603); (3) the publication is made to some person not reasonably believed to be necessary for the accomplishment of the purpose of the particular privilege (*see* § 604); (4) the publication includes defamatory matter not reasonably believed to be necessary to accomplish the purpose for which the occasion is privileged (*see*

345

§ 605); or (5) the publication includes unprivileged matter as well as privileged matter (*see* § 605A).

¶ 38. The defendant argues that a conditional privilege is not enough, because citizens will still have to "think twice" before testifying, knowing that they may face a jury trial on the abuse standards set forth above. *See Zinda*, 149 Wis. 2d at 924–26 (question whether a conditional privilege has been abused is a factual question for the jury, unless facts are such that only one conclusion can be reasonably drawn) (citing Restatement (Second) of Torts § 619(2) cmt. b (1977)). To the contrary, we view our decision today as a necessary and sufficient bridle upon a witness's testimony at a legislative proceeding of this sort.[9]

¶ 39. We note that a significant body of case law has developed to support the position that witnesses who supply voluntary testimony to a legislative body are entitled only to a conditional privilege. *See Fiore v. Rogero*, 144 So. 2d 99, 103 (Fla. Dist. Ct. App. 1962) (testimony given before legislative body conditionally privileged where witness appeared voluntarily without having been subpoenaed); *Adserv Corp. v. Lincecum*, 385 So. 2d 432, 433, 435 (La. Ct. App. 1980) (witness who appeared voluntarily before legislative committee afforded only a qualified privilege); *Wright v. Lathrop*, 21 N.E. 963, 966 (Mass. 1889) (unsworn witness who appeared voluntarily before legislative committee and who made the statement in question without being asked a question on the subject is entitled to conditional privilege only); *Bell v. Horton*, 669 N.E.2d 546,

---

[9] In concluding that the absolute privilege does not apply to legislative proceedings of this sort, we do not decide whether the absolute privilege would apply to witness testimony that is compelled by a subpoena, given under oath, or directed and supervised by questions from the legislative body.

549, n.3 (Ohio Ct. App. 1995) (distinguishing *North Coast Cable Ltd. Partnership v. Hanneman*, 648 N.E.2d 875 (Ohio Ct. App. 1994), to hold that unsolicited statements made at meeting of union township board of trustees entitled to qualified privilege only); *see also* 50 Am. Jur. 2d *Libel and Slander* § 296 (1995). These cases illustrate that others have walked before us on the path that we choose today.

¶ 40.   Because a conditional privilege will adequately protect the witness, yet still afford an injured party the opportunity to secure redress in an action for defamation, Mr. Vultaggio is entitled to have a jury determine whether Ms. Yasko abused her privilege at the Whitewater City Council meeting. The case is remanded to the circuit court for a determination of this issue.

*By the Court.*—The order of the circuit court is affirmed.

¶ 41.   WILLIAM A. BABLITCH, J. (*concurring*). I join the majority opinion. I write only to answer the dissent.

¶ 42.   Stripped to its core, the dissent would give absolute privilege to anyone to say anything about anybody at a school board proceeding, a city council proceeding, a county board proceeding, or any other legislative type proceeding, as long as the accusation was even remotely relevant.

¶ 43.   Free speech is not and should not be without its limits. Newspapers, radio, television, even the tabloids, have limits. They cannot accuse anybody about anything without facing consequences for malicious untruths. And with good reason. In an ordered society, in a society that should insist that people

accept responsibility for their actions, reasonable limits must be imposed.

¶ 44. Unfortunately, the dissent would remove those limits at legislative type proceedings, thereby creating a loophole through which the most irresponsible among us could drive an army. What is there to stop the simultaneous broadcast or the reporting of the vicious untruths to the general public? Reputations could be destroyed overnight while the dissent takes solace in cold, mechanical legal analysis and dubious authority. *See, e.g., Hartman v. Buerger*, 71 Wis. 2d 393, 238 N.W.2d 505 (1976).

¶ 45. As the majority opinion points out, the flow of information in today's society has changed enormously since the authority relied upon by the dissent. So too has the level of public discourse. Society has come a long way from the alleged defamatory "no good" reference in the 1976 *Hartman* case on which the dissent relies. In today's tabloid world, accusing someone of being no good is almost tantamount to a compliment.

¶ 46. The dissent fails to address the reality of the tabloid world set out in the example provided in the majority opinion because they cannot. As the example makes clear, the dissent's position would allow a knowingly false accusation of pedophilia or prostitution to be uttered with impunity in the name of "cleaning up the city" on a zoning petition.

¶ 47. Nor does the dissent provide a reasoned application of its proposed holding to the principles justifying an absolute privilege:

1. The dissent correctly states that the first principle justifying an absolute privilege is that it ensures that decision makers will be more fully informed. It fails to discuss how allowing an utterly false, mali-

cious, and destructive accusation furthers that end. It does not because it self-evidently cannot.

2. The dissent correctly states that the second principle justifying an absolute privilege is that it eliminates the chilling effect of defamation law and ensures that citizens will not be discouraged from participating in the democratic process by fear of later lawsuit. It fails to discuss how allowing an utterly false, malicious, and destructive accusation furthers that end. It does not because it self-evidently cannot.

3. The dissent correctly states that the third principle justifying an absolute privilege is that it encourages the free expression of ideas as part of the political process. It fails to discuss how allowing an utterly false, malicious, and destructive accusation furthers that end. It does not because it self-evidently cannot.

¶ 48. Have we come to a point in society where we will allow absolute protection to a knowingly false accusation, no matter how vicious, untrue, malicious, and destructive it is? As long as the accusation is, at its tenuous best "relevant," the dissent says we have. Fortunately, the majority disagrees.

¶ 49. ANN WALSH BRADLEY, J. (*dissenting*). The question certified to this court is whether the statements of witnesses at legislative proceedings are entitled to absolute or conditional privilege for purposes of defamation law. To this certified question the majority answers an unpredictable "Maybe."

¶ 50. Although at the outset the majority opinion purports to hold that testimony at a legislative proceeding is entitled only to conditional privilege, the real holding of the case appears to be that it could be either

349

absolute or conditional privilege, depending on the individual circumstances of each case. This appearance is underscored throughout the opinion when the majority ties its decision not to the general principles involved, but to the facts specific in this case.

¶ 51. In ignoring these principles, the analysis of the majority is misdirected and it arrives at an erroneous conclusion. Because an analysis of the policies underlying our adoption of absolute privilege for judicial proceedings demonstrates that those policies are equally applicable to declarants at legislative proceedings, I would apply absolute privilege to statements made at legislative proceedings for purposes of defamation law.

¶ 52. The majority analyzes this case as if our task is to decide where to draw a line between those legislative proceedings deserving of application of absolute privilege and those hearings sufficiently untrustworthy to deserve only conditional privilege. Admittedly, conducting such a demarcation would be a difficult task. It would require us to choose between the interests of society and the interests of the individual based on the circumstances of each proceeding. Depending on the nature of the government body, the parties to be examined, and the issues presented, the procedural requirements may vary dramatically. Testimony may be voluntary or subpoenaed, invited or unsolicited. Witnesses may be sworn or testify without oath. Inquiries may be by panel members, or comments accepted without specific direction.

¶ 53. The majority conducts just such an analysis of this case, focusing on the absence of procedural requirements affecting testimony before the Whitewater City Council and on the dearth of outside remedies available to the allegedly defamed individual. Ulti-

mately, the majority determines that the defendant may only be entitled to conditional privilege for her statements.

¶ 54.   Both the analysis and the conclusion provided by the majority are unsatisfactory. The majority misses the mark because it analyzes the case not in terms of whether policies supporting absolute privilege exist, but rather in terms of whether certain safeguards such as subpoena, sworn testimony, and supervision exist. In doing so, the majority paints itself into an untenable and unworkable corner.[1]

---

[1] The majority attacks this dissent as being "myopic" in its interpretation of the majority opinion. In developing this attack, the majority asserts at footnote 7 that its conclusions are based on a weighing of public policy and not on the presence of alternative procedural safeguards such as the subpoena power, potential supervision, or sworn testimony. However, proclaiming in a footnote that the majority analysis is really a policy discussion does not make it so.

The majority's repeated focus on potential alternative protections throughout the opinion, and offer of statements such as, "[d]ue to the lack of procedural safeguards in this case, however, we conclude that the public policy favoring a citizen's right to redress outweighs the policy concerned with discouraging a citizen's participation in the democratic process," contradicts the majority's footnote proclamation. Majority op. at n.7. The strength of the public policy argument for protecting an individual's reputation from "scurrilous attack," to use the majority's terms, is not now, and never will be, dependent upon the presence or absence of alternative protections.

Reasonable judges may differ on the conclusion of a policy debate. However, such an analysis should be conducted based on the independent merits of the opposing policy positions, not on whether the existence of alternative protections obviates the need for such a discussion.

¶ 55. The majority concludes that absolute privilege will not attach in this case because it lacks all of the procedural safeguards of the subpoena, sworn testimony, and supervision. Yet, the conclusion is untenable since the very cases relied upon by the majority in its analysis contradict this conclusion.

¶ 56. If a subpoena is an essential safeguard for absolute privilege, then how can the cases cited by the majority in which no subpoena was present be aligned with the majority's conclusion? *See Spoehr v. Mittelstadt*, 34 Wis. 2d 653, 150 N.W.2d 502 (1967) (extending absolute privilege to comments of counsel at preliminary conference); *Bussewitz v. Wisconsin Teachers Ass'n*, 188 Wis. 121, 205 N.W. 808 (1925) (applying absolute privilege to allegations in pleadings); *Jennings v. Paine*, 4 Wis. 372 [*358] (1855) (applying absolute privilege to statements of counsel).

¶ 57. If supervision is a critical safeguard to the grant of absolute privilege, then how can the majority justify this court's grant of absolute privilege in cases where there was no presiding officer to supervise the statement made? *See Hartman v. Buerger*, 71 Wis. 2d 393, 238 N.W.2d 505 (1976) (applying absolute privilege to defamatory telegram of county sheriff responding to character check as part of town board tavern licensing process); *Werner v. Ascher*, 86 Wis. 349, 56 N.W. 869 (1893) (holding absolute privilege probably applicable to unsolicited petition to town board to revoke liquor license); *Larkin v. Noonan*, 19 Wis. 93 [*82] (1865) (applying absolute privilege to statements in an unsolicited petition to the governor asking for the removal of a county sheriff).

¶ 58. If sworn testimony is necessary, then how can this court rationalize the grant of absolute privilege where the testimony is not sworn? *See Schier v.*

*Denny*, 12 Wis. 2d 544, 107 N.W.2d 611 (1961) (granting absolute privilege to allegations made in a complaint against a real estate broker to State Real Estate Broker's Board); *Schultz v. Strauss*, 127 Wis. 325, 327, 106 N.W. 1066 (1906) (extending absolute privilege to statements made to district attorney acting in official capacity).

¶ 59.   Indeed, there are cases within this jurisdiction in which absolute privilege has been applied and none of the essential safeguards espoused by the majority were present. *See Hartman*, 71 Wis. 2d at 398–400; *Bergman v. Hupy*, 64 Wis. 2d 747, 221 N.W.2d 898 (1974) (holding that statements to an assistant district attorney while seeking issuance of a criminal complaint are absolutely privileged); *Schultz*, 127 Wis. at 327.

¶ 60.   Equally problematic, the majority opinion fails to acknowledge that we have already applied absolute privilege to legislative proceedings in a number of instances. Although Wisconsin courts have not addressed the specific question of whether witnesses should be given absolute privilege when testifying before a legislative body, we have acknowledged application of absolute privilege to town boards in *Werner, DiMiceli v. Klieger*, 58 Wis. 2d 359, 206 N.W.2d 184 (1973), *Bergman* and *Hartman*.[2] Town boards, like city

---

[2] This court has noted that the "[absolute] privilege has been extended to judicial officers, legislative proceedings, and to certain governmental executive officers." *Zinda v. Louisiana Pacific Corp.*, 149 Wis. 2d 913, 440 N.W.2d 548 (1989) (finding communications between employer and employees concerning ex-employee's dismissal only conditionally privileged); *see, e.g., Yip v. Pagano*, 606 F. Supp. 1566 (D. N.J. 1985); *DeSantis v. Employees Passaic County Welfare Ass'n*, 568 A.2d 565 (N.J. App. 1990); *North Coast Cable Ltd. Partnership v. Hanneman*,

councils, are subsidiary legislative bodies constituted pursuant to authority delegated from the state legislature.

¶ 61. In *Werner*, the plaintiff claimed defamation based on written statements provided to a town board as part of a liquor license revocation proceeding. While the court disposed of the case on evidentiary grounds, the court noted that if the statement had been made only to the town board, it was probably absolutely privileged. *See Werner*, 86 Wis. at 351. Subsequent case law has relied upon this statement and further established the rule that town board liquor license proceedings are to be absolutely privileged. *See DiMiceli*, 58 Wis. 2d at 364 ("[S]uch absolute privilege has been extended to quasi-judicial proceedings, including. . .town board proceedings concerning a tavern license."); *see also Bergman*, 64 Wis. 2d at 751. In addition, in *Hartman*, this court explicitly refused to abrogate this application of absolute privilege, and applied it to a town board meeting to which a defamatory telegram had been submitted as evidence. *See Hartman*, 71 Wis. 2d at 397–400.

¶ 62. In each of these cases we have justified application of the privilege to the town board meeting on the grounds that the town board was determining matters in the public interest and thus was "quasi-judicial" in nature. In extending absolute privilege to such proceedings, we did not consider what alternate safeguards existed against defamation. Indeed, even had such safeguards been our primary concern, the presiding officer of a city council proceeding would seem to have equal, if not greater, control and supervi-

648 N.E.2d 875 (Ohio Ct. App. 1994); *Jennings v. Cronin*, 389 A.2d 1183 (Pa. Super. Ct. 1978); *Logan's Super Markets, Inc. v. McCalla*, 343 S.W.2d 892 (Tenn. 1961).

sion as officers of town boards in liquor license proceedings. Thus, the majority's conclusion that statements made to the Whitewater City Council, a municipal subsidiary of the legislature, are not privileged, appears inconsistent with our previous application of absolute privilege to other legislative subsidiaries.

¶ 63. Having pointed out these threshold inconsistencies, it is also significant that in none of the cases in which we have adopted absolute privilege has our decision been based on whether an otherwise defamatory statement was made under subpoena, while under oath, or while otherwise supervised. We have instead adopted absolute privilege based on our balancing of the important public policy interests at stake. Thus, any attempt to draw a line between the adoption of absolute or conditional privilege based on whether a witness is subpoenaed, sworn, or supervised[3] while making comments ignores the fundamental policy reasons behind application of absolute privilege to defamation actions.

¶ 64. The absolute privilege affirmative defense is justified "where the interests and necessities of society require that the time and occasion of the publication or utterance, even though it be both false and malicious, shall protect the defamer from all liability to prosecution for the sake of the public good." *Bacon v. Michigan Central R. Co.*, 33 N.W. 181, 183 (Mich. 1887). The interests and necessities referred to take three basic forms.

¶ 65. First, by eliminating the potential for personal liability of declarants, absolute privilege ensures

---

[3] Examples of such supervision include a member of the legislative body asking specific questions of the witness, or rules limiting the scope of a witness's comments.

that decision makers will be more fully informed. *See Kensington Development Corp. v. Israel*, 142 Wis. 2d 894, 900, 419 N.W.2d 241 (1988). Second, absolute privilege eliminates the chilling effect of defamation law and ensures that citizens will not be discouraged from participating in the fundamental democratic process by fear of later suit. As we have noted in the past, "If parties are shadowed by the fear that by some mistake as to facts or some excess of zeal, or by some error. . .they may be subjected to harassing litigation. . .they may well feel that justice is too dearly bought and that it is safest to abandon its pursuit. . . ." *Bussewitz v. Wisconsin Teachers' Association*, 188 Wis. 121, 124–25, 205 N.W. 808, 810 (1925).

¶ 66.    Finally, absolute privilege encourages the free expression of ideas as part of the political process. *See DeSantis v. Employees Passaic County Welfare Ass'n*, 568 A.2d 565, 567 (N.J. App. 1990). Accordingly, the issue of whether this privilege should be applied to witnesses before legislative bodies requires a determination of whether the risk of uncompensated reputational harm is outweighed by the public policy of encouraging citizen participation in such proceedings.

¶ 67.    Where the balance tips in favor of the societal interests, absolute privilege, as set out in Restatement (Second) of Torts § 590A (1977) provides that:

> A witness is absolutely privileged to publish defamatory matter as part of a legislative proceeding in which he is testifying or in communications preliminary to the proceedings, if the matter has some relation to the proceeding.

Such statements are subject only to the procedural safeguards that they be made in a context to which the

privilege has been applied, and the substantive safeguard that the statement be relevant to the matter being considered. *See Snow v. Koeppl*, 159 Wis. 2d 77, 81, 464 N.W.2d 215 (Ct. App. 1990). To promote the public interest, relevancy is to be liberally construed. *See id.*

¶ 68. Despite the majority's contention to the contrary, the liberal relevancy test is not a superficial doctrine providing no protection to the allegedly defamed. Statements which have no relation to the issues under discussion do not receive the benefit of the privilege. Indeed, this court has explicitly relied upon the relevancy requirement to reject arguments that a conditional privilege was necessary to prevent hearings from becoming "forum[s] for unfettered character assassination." *See Hartman*, 71 Wis. 2d at 400 (rejecting arguments based on *Melton v. Slonsky*, 504 P.2d 1288, 1291 (Ariz. Ct. App. 1973)).

¶ 69. In rejecting the "relate to" requirement of absolute privilege, the majority asserts its view that accusations of pedophilia, prostitution or purveyance of pornography against a local resident sufficiently "relate to" a hearing on municipal beautification to invoke the privilege. I disagree with the majority's conclusion that "any court's interpretation would almost certainly" find that calling a neighbor a pedophile relates to the issue of municipal beautification. Majority op. at 338. Not only is the conclusion incorrect, but such a blanket assertion does a disservice to the courts in this state that may not be inclined to embrace the majority's conclusion that pedophilia relates to municipal beautification.

¶ 70. Where statements are relevant to issues arising in a judicial proceeding, this court has recognized the importance of protecting the societal interest

in obtaining full disclosure of facts and in hearing arguments from interested parties. *See Bussewitz*, 188 Wis. at 127–28. Our recognition of this societal interest is equally, if not more, applicable to proceedings before legislative entities.

¶ 71. Judicial proceedings resolve questions of rights between a small number of parties and are protected by absolute privilege. Quasi-judicial proceedings also receive the privilege, in part because the societal interests upon which absolute privilege is based are even more forceful where a quasi-judicial proceeding is deciding between the public interest and a private interest. *See Schier*, 12 Wis. 2d at 548.

¶ 72. This same justification argues in favor of applying absolute privilege to legislative hearings. Legislative entities are the arbiters of the public interest, after input and argument through the democratic process. *Cf. Schier*, 12 Wis. 2d at 548. The very interests that make absolute privilege necessary for communications made in judicial and quasi-judicial proceedings are also essential to the legislative process. The legislature must be fully informed to enact suitable legislation. *See Yip v. Pagano*, 606 F. Supp. 1566, 1571 (D. N.J. 1985).

¶ 73. This is true regardless of the size or scope of authority of the particular legislative body in question. *See* Restatement (Second) of Torts § 590 cmt.c (1977); *Kelly v. Daro*, 118 P.2d 37, 38 (Cal. App. 1941). Whether the declarant is speaking before the state legislature, a county board, or a committee of a municipal council, the democratic process requires an atmosphere of openness wherein citizen participants can petition their government officials without fear of being forced to defend their statements later in court. *See Webster v. Sun Company, Inc.*, 731 F.2d 1, 4 (D.C. Cir. 1984). The

majority's holding does not create such an open and democratic environment.

¶ 74. Compounding the majority's error in refusing to apply absolute privilege is the majority's advocacy of an unworkable frame of analysis. The opinion is unworkable since it provides little guidance to courts and its result impedes the democratic process. By applying conditional privilege to this case and refusing even to elucidate a standard of application for future cases, the majority leaves the trial court without direction as to how to apply absolute or conditional privilege, except on a case-by-case basis. The majority also leaves open the possibility that a citizen who might otherwise offer information on important local issues will remain silent because of a fear of reprisal.

¶ 75. Under conditional privilege, the target of a declarant's comments at a legislative hearing may respond by filing suit for defamation. As recently noted in the cover story of the ABA Journal:

> Increasingly, Americans who speak out in opposition to private development plans before local zoning boards, testify at school board meetings or circulate petitions to their elected officials are finding themselves in court, defending themselves against lawsuits by developers, landowners. . .claiming to have been defamed or otherwise injured by public comment.

*See* Alexandra D. Lowe, *The Price of Speaking Out*, 82 A.B.A. J. 48, 48–49, Sept., 1996.

¶ 76. Regardless of whether such suits are legitimate grievances or SLAPP suits (Strategic Lawsuit Against Public Participation), the possibility of a multimillion dollar lawsuit may chill democratic participation and keep citizens out of committee rooms.

A grant of only conditional privilege to witnesses at legislative proceedings impedes the workings of our democratic process:

> "[B]oth individuals and groups are now being routinely sued in multimillion-dollar damage actions for such "All-American" political activities as circulating a petition, writing a letter to the editor, testifying at a public hearing, reporting violations of law, lobbying for legislation, peacefully demonstrating, or otherwise attempting to influence government action."

*See id.* at 48 (quoting George W. Pring & Penelope Canan, *SLAPPs: Getting Sued for Speaking Out* (1996)).

¶ 77. Defamation suit defendants and observers of those suits may choose in the future not to be involved and to remain silent. The more emotional energy and financial capital expended to defend such suits, the less incentive or energy there is to contest the underlying project. Accordingly, to promote the policies that ensure democratic participation and a free and frank discussion of issues, absolute privilege should protect statements made in legislative proceedings from the threat or reality of a defamation lawsuit.

¶ 78. Foreign jurisdictions also do not provide the majority analysis with sufficient cover from the legitimate policy objectives just discussed. Citing four cases from foreign jurisdictions, the majority proclaims that "a significant body of case law has developed to support the position that witnesses who supply voluntary testimony to a legislative body are entitled only to a conditional immunity." *See* majority op. at 345. While a grant of conditional privilege may be the ultimate holding of a very limited number of cases cited by the

360

majority in support of its result, their number is far less than the "significant body of cases" claimed by the majority. More importantly, the reasoning they employ is contrary to Wisconsin's established privilege jurisprudence and unsupportive of the majority's rationale.

¶ 79.   In *Adserv Corp. v. Lincecum*, 385 So. 2d 432 (La. Ct. App. 1980), the court applied conditional privilege to a legislative hearing only after acknowledging that Louisiana, unlike Wisconsin, applies only conditional privilege to statements at judicial proceedings. In *Bell v. Horton*, 669 N.E.2d 546 (Ohio Ct. App. 1995), the court did not even consider whether statements of legislative witnesses were subpoenaed or sworn, and ignored the issue presented here by instead applying conditional privilege based on statements made to a public officer with the authority to take action in the public interest.

¶ 80.   *Wright v. Lathrop*, 21 N.E. 963 (Mass. 1889) was resolved in a similar manner, with the court refusing to label as a witness an unsubpoenaed declarant at a legislative committee meeting. That court also applied conditional privilege to statements made to public officers in the public interest. Finally, in *Fiore v. Rogero*, 144 So. 2d 99 (Fla. Ct. App. 1962), the court did apply conditional privilege to statements of witnesses at legislative hearings. However, in taking this action, the *Fiore* court failed to consider and balance the public interest in unconstrained statements and the individual's interest in protection of reputation.

¶ 81.   Thus, the reasoning employed by the foreign cases around which the majority rallies does not align with this court's prior focus on the public policy merits of adopting absolute or conditional privilege. Accordingly, we should not then deviate from our prior

case law and adopt the majority's new framework of analysis.

¶ 82. In addition, the majority's extensive evaluation of the alternative remedies available to an allegedly defamed individual misses the point that absolute privilege was created to address. Admittedly, the application of absolute privilege to defamation actions arising out of legislative proceedings, just like the application of absolute privilege to defamation actions arising out of judicial and quasi-judicial proceedings, results in a limitation of remedies to the allegedly defamed in those proceedings. By focusing on the alternative remedies offered by the plaintiffs in response to a question at oral arguments, the majority obfuscates the proper focus of inquiry.

¶ 83. When absolute privilege is applied to a proceeding, it is because the public interest in disclosure of statements at those proceedings outweighs the private interest in protecting one's reputation. Although tort remedies may still be available to the alleged victim, the public interest in preserving participation and exposing the truth trumps suits for defamation. The individual's right of redress is thus purposefully subservient to the public interest protected by the privilege, and the absence of alternative remedies is irrelevant.

¶ 84. The concurring opinion, like the majority, espouses conditional privilege, but fails to engage in a policy discussion weighing these competing public interests. Like the majority, the concurrence fails to address the invidious effects of conditional privilege upon the democratic process. Like the majority, the concurrence fails to acknowledge that we have previously applied absolute privilege to witnesses in legislative proceedings and that the application of

absolute privilege to legislative witnesses is consistent with our prior case law.

¶ 85.  More importantly, it is noteworthy that the concurrence does not consider the full scope of its own argument. If this court is to apply conditional privilege to the situation presented here based on a perceived threat to America's "ordered society" by the tabloid media, how then can the majority not agree to abrogate all applications of absolute privilege in situations, including judicial proceedings where defamatory statements might be uttered? The arguments of the concurrence could be cited as support for eliminating absolute privilege currently enjoyed by parties to a judicial proceeding or the privilege accorded legislators and city council members at legislative hearings. Legislators have far greater access to the media than has an individual homeowner commenting at a city council meeting. Yet, this court endorses the protections of absolute privilege for legislators and city council members at legislative meetings but allows no such protection for witnesses at such meetings. If indeed the tabloid media is going to rule our law, why should it not then rule it uniformly?

¶ 86.  Further attacking the dissent for using "cold" legal analysis in its approach to this question of law, the concurrence fails to cite any authority in support of its conclusion. Instead, it substitutes hypotheticals for legal analysis.

¶ 87.  After raising the specter of tabloid journalism run amok, the concurrence attacks this dissent as "fail[ing] to discuss how allowing an utterly false, malicious, and destructive accusation furthers" the three policy justifications for absolute privilege. Concurrence at 347–48. In making this assertion, the concurrence missteps in resting its argument on the extreme case,

an alleged statement that is by definition defamatory, rather than looking to the value of unfettered discourse.

¶ 88.   I agree that allowing such a statement, with the full prior knowledge of all concerned that the statement is "utterly false," would do a disservice. However, neither this court, nor the parties to this case, have the benefit of such prescience or the luxury of such a narrow perspective. As discussed above, we must instead be concerned with the effects our adoption of conditional privilege will have on the democratic process, decision makers and free expression, where there are witnesses who would comment in a truthful manner but for fear of a meritless suit for defamation.

¶ 89.   Finally, without explanation and again without offering any legal analysis in support of the assertion, the concurrence offers a sweeping assertion that the authority relied upon by the dissent is "dubious." Apparently resting its "dubious" authority conclusion upon the age of the case, the concurrence cites *Hartman* as the lone example of its sweeping assertion. *Hartman* is of a 1976 vintage. If the concurrence applied the same reasoning to the cases cited in the majority opinion, almost one-half of the majority's cited authority would be deemed "dubious." *Hartman* and the other cases cited in this dissent are the controlling legal precedent of this court until they are overruled by the court—an action not taken by the majority today.

¶ 90.   This court is asked to decide whether statements of witnesses at legislative proceedings are entitled to absolute or conditional privilege for purposes of defamation law. The majority focuses on procedural safeguards and the right to redress. In applying absolute privilege to judicial and quasi-judi-

cial proceedings, Wisconsin courts have never held the existence of alternative safeguards to be determinative. The majority's concern for the right of redress is no different than arguments rejected by this court each time it has adopted or applied absolute privilege to defamation actions. Because I believe that adopting absolute privilege for legislative witnesses is consistent with our prior decisions and supported by public policy, I respectfully dissent.

¶ 91.   I am authorized to state that Chief Justice Shirley S. Abrahamson and Justice Donald W. Steinmetz join this opinion.